FLIGHT KITCHEN, INC., Plaintiff-Appellee, *v.* CHICAGO SEVEN-UP BOTTLING Co., Defendant-Appellant.

(No. 57920;

First District (4th Division)—August 28, 1974.

560

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas F. Tobin, and Michael P. Connelly, of counsel), for appellant.

B. John Mix, Jr., of Chicago, for appellee.

Mr. JUSTICE BURMAN delivered the opinion of the court:

This appeal evolves from an action brought in the circuit court by Flight Kitchen, Incorporated, an Illinois corporation, against Chicago Seven-Up Bottling Company (hereinafter referred to as Seven-Up) to recover damages allegedly suffered by reason of an averred trespass to the property of Flight Kitchen by an attorney, Harry Leviton, when he, in enforcing a judgment rendered on behalf of Seven-Up against a third corporation, Plan for Hospital Foods, Incorporated, wrongfully directed the sheriff to levy against the property of Flight Kitchen. After a jury trial, Flight Kitchen was awarded $12,000 in damages and, in addition, $12,000 in punitive damages. The trial court entered judgment on that verdict and this appeal by Seven-Up follows.

Seven-Up contends: (1) the court erred in failing to direct a verdict in its favor; (2) the damages awarded are excessive; and (3) the cumulative effect of trial errors deprived it of a fair trial.

The basic facts are these: Plan for Hospital Foods, an Illinois corporation, owed money to Seven-Up. The delinquent account was turned over by Seven-Up to Dun & Bradstreet, Incorporated, for collection. Attorney Harry Leviton received the account from Dun & Bradstreet. He brought suit and on June 15, 1967, obtained a judgment on behalf of Seven-Up against Plan for Hospital Foods in the amount of $1499.60. On April 18, 1967, he had previously billed Seven-Up for a retainer fee of $75 and for court costs in the amount of $25. Seven-Up paid these amounts. Prior to directing a levy to enforce the judgment, Leviton requested Seven-Up to execute the necessary bond for that purpose and Seven-Up did so. He then directed the sheriff to levy on property at 9561 Franklin Avenue in Franklin Park, Illinois. This address was the registered address of both Plan for Hospital Foods and Flight Kitchen. At this location the deputy sheriff was told by one Adam Senese, the president and registered agent of both Flight Kitchen and Plan for Hospital Foods, that he was at the wrong premises and the property there was owned solely by Flight Kitchen and not Plan for Hospital Foods. The deputy sheriff reported the conversation to Leviton by telephone and was told by him that it was only a cover-up and that he should proceed with the levy and close the business. The deputy finally effected the levy 2 weeks later and padlocked the premises. As a result various perishable foods on the premises deteriorated and had to be removed by Franklin Park Health Department officials.

In the original complaint filed on October 27, 1967, Flight Kitchen named as defendants, Seven-Up, Dun & Bradstreet, Inc., a New York corporation; Joseph I. Woods, Sheriff of Cook County; Edward Chmielweski and John Clemens, individually and as Deputy Sheriffs of Cook County. Orders were subsequently entered dismissing the sheriff and the deputy sheriffs from the suit and allowing the motion of defendant Dun & Bradstreet for a summary judgment in its favor. It was further held in the latter judgment order that as a matter of law, Harry Leviton, the attorney ordering the levy, was neither the agent nor attorney for Dun & Bradstreet. All of the aforementioned orders specifically provided that they were immediately appealable, but no appeals were taken from them.

It is initially contended by Seven-Up that the court erred in failing to grant a directed verdict in its favor, citing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504. It is first urged in support of this proposition that Seven-Up was not responsible for the actions of

Leviton, the attorney who ordered the levy, and second, that the levy on Flight Kitchen did not constitute an unlawful trespass.

Seven-Up disclaims any responsibility for the conduct of Leviton, first, because it views him as an independent contractor as a matter of law. It is argued that whether one views Leviton as an independent contractor working for Dun & Bradstreet or as an independent contractor working for Seven-Up, the important matter is the absence of any control by Seven-Up which is necessary to establish liability on its part. (*Henry v. Industrial Commission*, 412 Ill. 279, 106 N.E.2d 185.) Heavy reliance is placed on *Weinrob v. Heintz*, 346 Ill.App. 30, 104 N.E.2d 534. In that case a lawyer filed a complaint alleging negligence in the operation by the defendant of a motor vehicle while he was a passenger. The defendant requested the submission of a special interrogatory to the jury inquiring whether the plaintiff should be considered to have been in the employ of a certain corporation at the time of the accident, thus presumably entitling him to a remedy under the Workman's Compensation Act and precluding his recovery against the defendant. The court found no evidence to support the submission of the special interrogatory, and held, specifically under the factual situation presented, that the plaintiff was exercising an independent discretion and judgment while acting for his client. This case is clearly not controlling here, where the plaintiff asserts liability of a client for the acts of his attorney in pursuing a legal proceeding on behalf of the client.

■■ Seven-Up asserts that by the very nature of his duties and responsibilities, an attorney is better characterized as an independent contractor rather than as an agent. Seven-Up cites no case, however, and we are aware of none, which holds that an attorney who files a suit and obtains a judgment for someone is an independent contractor. In *Oberne v. O'Donnell*, 35 Ill.App. 180, and *Golden v. Cervenka*, 216 Ill.App. 397, both relied on by the defendant, we find no such general proposition enunciated, but rather find that under the facts presented in those cases, which are clearly disparate from the facts of the instant case, the client was not properly bound by the acts of the attorney. The general rule, as we understand it, is that a client is bound according to the ordinary rules of agency by the acts of his attorney within the apparent scope of his authority (*Bond v. Duntley Manufacturing Co.*, 195 Ill.App. 576 (abstract opinion)), and this rule may be extended to hold a client liable for an injury to a third person resulting from an act of the attorney which is within the scope of the attorney's authority (see 7 C.J.S. *Attorney and Client* § 68 (1937); Restatement (Second) of Agency § 253 (1958); see also *Atlantic Co. v. Farris*, 62 Ga.App.212, 8 S.E.2d 665).

A second variation on Seven-Up's contention that Leviton was not its

agent is based on a review of the facts presented. It is urged that Seven-Up had no control over Leviton, that Leviton looked to Dun & Bradstreet as his employer, that Seven-Up had nothing whatsoever to do with hiring him, that it likewise had nothing to do with the decision to sue Plan for Hospital Foods, and lastly that it was not even aware of the levy until informed of it by Dun & Bradstreet.

■■ Our view of the facts compels us to reject Seven-Up's argument. The sole issue before us concerns the levy ordered by Leviton. It is undisputed that he obtained a judgment in the name of Seven-Up against Plan for Hospital Foods. It can hardly be said, from the evidence, that Seven-Up was unaware of this, or that it did not know that Leviton was proceeding to levy on the premises at 9561 Franklin. Indeed Seven-Up executed a bond for that reason with full knowledge that a levy was to be made for the purpose of satisfying its judgment against Plan for Hospital Foods. Had it not executed the bond neither the sheriff nor Leviton could proceed to levy. It is clear to us that Leviton was not only acting as Seven-Up's agent within the scope of his authority, but that he was also acting with the full knowledge and direction of his client Seven-Up.

We next consider Seven-Up's contention that the levy on the Flight Kitchen property did not constitute an unlawful trespass. This argument is premised on Seven-Up's claim that the court should have disregarded the separate corporate entities of Flight Kitchen and Plan for Hospital Foods as a matter of law because Adam Senese, the president of both corporations, consistently held out the corporations as having one single identity and operated them out of one pocket, and that the corporations were for all practical purposes one and the same.

Seven-Up directs our attention to *Holland v. Joy Candy Manufacturing Corp.*, 14 Ill.App.2d 531, 145 N.E.2d 101. That case involved a suit against two corporations for services performed by the plaintiff in the preparation and placing of advertising for a candy product manufactured by one corporation and retailed by the other. Originally the entire candy business was operated as a partnership. The partners later organized the two corporations. The stock in both corporations was divided equally between them and both were officers and directors of the two companies. Later the widow of one of the original partners acquired all of the stock in both corporations. As president, treasurer, and director of both corporations, she actively managed them from the same building where they both had their offices. Both had the same telephone number, switchboard, bookkeeper, time clerk and desk. Statements for plaintiff's services were sent to both companies. The appellate court found that the trial court was justified in viewing one corporation as a "mere instrumentality" of the other corporation, and held that "the affairs of the two

corporations were so managed and controlled by the same interlocking officers, directors and single stockholder, as to constitute one corporate entity in its dealings with creditors." 14 Ill.App.2d at 535, 145 N.E.2d at 104.

The facts of the instant case show that Adam Senese was indeed president and also registered agent of both corporations, and that the registered address of both corporations was 9561 Franklin Avenue, Franklin Park, Illinois. The ownership of the corporations, however, was distinct. The shareholders of Flight Kitchen were Cecilia Senese, 3,997, Zanida Irace, 1000 shares, and Allan Smietanka, Joseph Smietanka, and Adam Senese, one share each. The shares of stock in Plan for Hospital Foods were equally divided between Frank Smietanka, Ed Garrigan and Adam Senese. The physical operations of the two corporations were also distinct. Flight Kitchen catered to various airlines by providing them primarily with frozen meals and sometimes with hot or "chilled" food. Its place of business was at 9561 Franklin in Franklin Park, Illinois, where all of its equipment was also located. Plan for Hospital Foods never operated at the above address, only at Northlake Hospital at 365 East North Avenue in Northlake, Illinois. Its only function was to prepare and set up the foods for the patients in that hospital. The corporation employed approximately 12 to 14 employees at the hospital who prepared the food and one girl who took care of administrative duties.

Seven-Up points to testimony by Mr. James McGuire, division sales manager for Chicago Seven-Up, that credit was extended to Plan for Hospital Foods only because Seven-Up already did business with Senese through Flight Kitchen. When Plan for Hospital Foods became delinquent, McGuire said he was told by Senese that the bill could not be paid until the airlines paid money owed to Flight Kitchen. When Senese did make a $100 payment on the Plan for Hospital Foods account, the check was drawn on Flight Kitchen. A second $100 check bounced. Further testimony shows that at Seven-Up, the accounts of the two corporations were not separate, and Plan for Hospital Foods was billed at the registered address of the corporation. This, claims Seven-Up, is overwhelming evidence that the two corporations were run from one pocket.

It is undisputed, however, that the Seven-Up beverage was ordered by Senese for the hospital and delivered there. McGuire himself testified that when Senese explained why the account was not paid, he (McGuire) said: "Well, we're not doing business with the airlines. We're doing business with you at the Northlake Hospital. And this product that we had sold you delivered to the hospital has subsequently been sold to the hospital * * *." The levy as already indicated was con-

ducted at 9561 Franklin and not at the hospital where Plan for Hospital Foods operated its business.

We note at the outset that Seven-Up did not institute any proceeding in an attempt to pierce a corporate veil or have one corporation deemed liable for the other's debts. (*Cf. Holland v. Joy Manufacturing Corp.*, 14 Ill.App.2d 531, 145 N.E.2d 101.) It merely took the position that the two corporations were operated as one and levied on the property of Flight Kitchen on the basis of a debt owed by Plan for Hospital Foods. The doctrine of corporate entity is clearly one of substance and vitality. It is to be ignored with caution only when circumstances clearly justify it. (*Superior Coal Co. v. Department of Finance*, 377 Ill. 282, 36 N.E.2d 354.) Any uninduced expectations, misunderstanding, or presumptions as to the legal status of the corporations on the part of Seven-Up hardly entitled it to levy with impunity on goods belonging to a corporation other than the one against which the judgment was obtained.

■■ Furthermore we feel the evidence indicates that the two corporations were not properly considered the same. They operated different types of businesses at different locations. Their structures were distinctly different. It is undisputed that Seven-Up sold its product to Plan for Hospital Foods on credit at the hospital premises. We find no error in the trial court's failure to disregard the separate corporate entities as a matter of law and in its decision to submit the question of an unlawful trespass to the jury. The other case authority cited by Seven-Up clearly does not compel a different conclusion.

It is next contended that the damages awarded to Flight Kitchen are excessive as a matter of law since there was insufficient evidence to sustain the general damages awarded and the jury should not have been allowed to consider the question of punitive damages.

As to the general damages, it was stipulated by the plaintiff during trial that its only claim therefore was based on the loss of perishable foods. The evidence shows without contradiction that the sheriff padlocked the premises and Flight Kitchen was shut down. Adam Senese testified that at that time a freezer on the premises measuring 30 feet long by 12 feet wide was completely loaded with raw meat and completed frozen meals and vegetables. He said there were about 465 chilled casseroles and 5500 to 7500 frozen plates containing filet mignon, lobster thermidor, swiss steak, chicken kiev, and chicken cordonbleu. Depending upon whether the flight was a domestic airline flight or an international flight, the price of each of the meals ranged from $2.75 to $5.75. Walter Leski, a health officer for the Village of Franklin Park, who cleaned out the Flight Kitchen premises in September of 1967, testified that in addition to the prepared foods there were lobster tails, choice cuts of beef,

and every other type of food imaginable in a state of decay and that the stench was unbearable. He was at the premises from approximately 10 A.M. to 5 P.M. during which time men carried out the food in garbage cans and filled a scavenger truck to capacity.

■■ It is argued that the testimony of Senese was sheer speculation and insufficient to prove the value of the loss and that all of the above testimony was insufficient to sustain the general damages awarded. We initially agree with Seven-Up that in an action for damages for destruction of personal property, the plaintiff has the burden of establishing the damages which result from the defendant's tortious act. (*New York, Chicago & St. Louis R.R. Co. v. American Transit Lines, Inc.*, 408 Ill. 336, 340, 97 N.E.2d 264, 266.) We disagree, however with Seven-Up's contention that this burden was not met. The record reveals that Senese had been in the airline catering business for 18 years and that he could validly fix the value of the foodstuffs involved. The weight of his testimony was for the jury. Corroborative testimony shows that all of the food was completely destroyed. We feel the fact of damage seems clear, and that the testimony provided sufficient criteria for the jury in determining the amount of damage incurred. In *City of Joliet v. Fox*, 135 Ill.App. 444, cited by Seven-Up, there was no testimony at all relating to the dollar value of certain items of damage alleged, which were susceptible of proof in terms of dollars and cents, thereby clearly distinguishing that case from the case at bar.

Seven-Up also urges that since the testimony of Senese was essential to the plaintiff's case on damages, the court erred in refusing to allow impeachment of Senese's credibility by means of extrinsic evidence, *i.e.*, the testimony of three witnesses. It is contended that the witnesses' testimony, as illustrated by an offer of proof, would have contradicted Senese's statements that he had discontinued any catering business after the levy in August of 1967.

■■ We have reviewed Seven-Up's offer of proof and hold that the court committed no error in barring the evidence. The general rule is that extrinsic evidence of self-contradiction is not allowed on matters "collateral" to the case in chief. (3 Wigmore, Evidence § 1020 (3d ed. 1940).) Here Senese's activity subsequent to the time losses were incurred as a result of the levy was in no way at issue in the case. Damages were sought only for the loss of the food on the premises at the time of the levy, and not for the loss of any future business. Since we perceive no purpose, independent of the self-contradiction, for which the proffered testimony could have been allowed into evidence, the testimony was not improperly excluded.

Regarding the punitive damages awarded, Seven-Up contends that

the jury should not have been allowed to consider them and that there was insufficient evidence to warrant an instruction on the matter. Furthermore, the instruction given is claimed to have improperly defined "wilful and wanton conduct" as that term is employed in trespass actions based on improper levy.

Seven-Up asserts first that to establish a case for punitive damages in a trespass action based on an improper levy, merely showing that the defendant was warned that he was levying on the wrong property is not sufficient if he has a reasonable belief that his claim to the property is just. Primary reliance is placed on *Beveridge v. Rawson*, 51 Ill. 504, where the goods of one other than the judgment debtor were also seized upon execution. Exemplary damages were awarded, but the Illinois Supreme Court reversed, finding error in the instruction given the jury regarding them. The instruction proposed:

> "If the jury find for the plaintiff, and also believe from the evidence that the defendants were repeatedly and positively warned that the property taken by them was the property of the plaintiff, then the plaintiff is entitled to exemplary damages, and the jury are the judges of the amount to be so given." 51 Ill. at 505.

The court there found that the defendants, in enforcing execution on the goods, were acting in pursuance of what they conceived was a just claim, and that they should not be held liable for punitive damages merely because they were warned of a claim to the goods by the plaintiff, as the instruction stated. Just because the goods were seized against the remonstrances of the plaintiff could not of itself show that the seizure and sale were malicious, and, "[i]n the absence of malice, or abuse of process, or a desire to do injury, damages should be compensatory only." (51 Ill. at 506.) The court concluded by noting that it appeared that more than one-half of the damages awarded in the case were punitive. Seven-Up urges that, even assuming it received warnings against levying on the goods in the case at bar, there was considerable testimony that the two corporations were really operated as one, and that therefore there was, based on *Beveridge*, no ground for punitive damages.

Seven-Up also relies on *Beveridge* in urging that the instructions given in the instant case regarding punitive damages were improper, thus requiring reversal even if there was sufficient evidence to submit the issue to the jury. The instructions were as follows:

> "If you find that the Defendant was guilty of wilful and wanton conduct which proximately caused injury to the Plaintiff and if you believe that justice and the public good require it, you may, in addition to any damages to which you find the Plaintiff entitled,

award the Plaintiff an amount which will serve to punish the Defendant and to deter others from the commission of like offenses.

When I use the expression 'wilful and wanton conduct' I mean a course of action which shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard for the property of the Plaintiff."

Seven-Up argues that the latter instruction accurately defines "wilful and wanton conduct" as it is used in "guest statute" cases, but not in trespass actions based on improper levy. Since the *Beveridge* opinion indicates that mere warnings are insufficient to sustain a finding of punitive damages, and employs the phrase "desire to injure" to gauge conduct worthy of such damages, "[i]t is clear that something more than an indifference for the property of the plaintiff is required" to allow punitive damages. The instruction given is therefore presumably deemed erroneous for allowing recovery where there is an "utter indifference" to the property of another.

■■ Directing ourselves first to the claimed error in the instruction, we recognize that "malice" (*Beveridge v. Rawson*, 51 Ill. 504) and "wanton and wilful conduct" (*Miller v. Kirby*, 74 Ill. 242) are indeed a basis for granting exemplary damages. But our reading of *Beveridge* in no way indicates to us that punitive damages are precluded where an "utter indifference" to another's property can be demonstrated, nor that a specific "desire to injure" is a *sine qua non* to the imposition of punitive damages for improper levy. Malice can be inferred (*Taneski v. St. Louis Merchants' Bridge Terminal Ry. Co.*, 230 Ill.App. 300), and conduct "wanton, reckless, and in a large degree lawless" has also been used as a standard for determining the imposition of punitive damages in a situation similar to the case at bar (*Walter v. Kirsch*, 143 Ill.App. 314). We therefore feel here that the court's instruction defining "wilful and wanton" was a proper statement of the law.

We consider next then whether the jury was entitled to find under the evidence that Seven-Up acted wilfully and wantonly, as properly defined in the instruction, in levying on Flight Kitchen's property. The evidence shows that Seven-Up procured a judgment against Plan for Hospital Foods and on August 2, 1967, levied against the property of Flight Kitchen at 9561 Franklin in Franklin Park. Although this was the registered address of Plan for Hospital Foods, it was not where that corporation operated its business nor where the product of defendant Seven-Up was delivered. The only business sign on the premises identified it as that of Flight Kitchen. Before the deputy sheriff proceeded to levy he was informed by Adam Senese that the property belonged to Flight Kitchen and that he was at the wrong place. The deputy then

called Leviton, the attorney who had ordered the levy, and told him of the claim that the property did not belong to the debtor. He said Leviton told him that it was probably a cover-up, and that he should proceed with the levy and close the business unless a $250 payment was immediately paid on the account. Senese called his attorney, then made out a check for $250, writing on the back of it "under duress."

On August 9, 1967, the attorneys for Flight Kitchen informed Leviton by letter that not only had he instigated a levy against the wrong party, but that the levy was being made on property worth over $60,000. The judgment being enforced was for $1499.60. They reminded him that on August 2 they had advised him that the wrong party was being levied against and they were now putting him on notice of the error. They also stated that Flight Kitchen had informed them that under duress and solely to protect its business from irreparable damages it had issued a $250 check, and that any further malicious interference with the conduct of the business of their client would not be tolerated and Seven-Up would be held accountable for damages which could exceed $100,000. A copy of the letter was sent to Seven-Up. James A. Lang, Chicago Seven-Up's director of finance and an attorney, testified that he received a copy of the letter and discussed it with his superiors. The collection of the debt was one of his responsibilities. He knew that a levy was being made and that Seven-Up had signed a bond for that purpose. On August 28, 1967, despite the foregoing, the deputy sheriff again appeared at the premises on orders of Leviton, padlocked it, and seized all of Flight Kitchen's property. No prior attempt to secure a judicial determination that Flight Kitchen was legally responsible for the debt of Plan for Hospital Foods is apparent.

██ It is axiomatic that one who places a levy must exercise great care to protect the rights and property of persons who are not the judgment debtors. We feel that under all the evidence the jury could properly find that Seven-Up acted with (in the language of the instruction properly given) "an utter indifference to or conscious disregard for the property of the Plaintiff." We note too a much higher verdict could have been supported by the evidence.

██ Seven-Up next raises a series of alleged trial court errors which it feels precluded the possibility of a fair trial and an unbiased verdict in its favor. It is asserted that reference by plaintiff's counsel, by one of plaintiff's witnesses, and by the trial judge to Leviton as the "attorney" for Seven-Up prejudiced a favorable finding on the ultimate issue of his status in relation to Seven-Up. In this regard we note that it is difficult to perceive how a lawyer can file a lawsuit and levy an execution on behalf of someone to collect a debt owing to that individual and

not be deemed, at least in common parlance, the "attorney" for that person. In any event the ultimate question here was not whether Leviton was "attorney" for Seven-Up in that sense, but whether Seven-Up was liable for certain of his actions. We therefore find no error. It is also asserted that the admission of testimony as to certain statements made by the deputy sheriff while executing the levy was improper and prejudicial; that a remark by plaintiff's counsel in his opening statement and by one of plaintiff's witnesses while testifying that Plan for Hospital Foods ceased business because some third party owed it money created improper prejudice and sympathy for the plaintiff in the minds of the jurors; that a remark by plaintiff's counsel in closing argument, to the effect that if Seven-Up wanted to push the blame off on Dun & Bradstreet or the sheriff it should bring an action against them, raised a prejudicial inference that Seven-Up would not be harmed by an adverse verdict; that counsel for plaintiff argued facts not in evidence by alluding to alternative remedies available to Seven-Up in enforcing its judgment; and that undue restrictions placed upon Seven-Up's counsel in the examination of witnesses and the court's refusal to admit certain documents precluded a fair trial. These alleged errors need not be detailed at any length here, for the ultimate question on this appeal is not whether the trial was scrupulously free from error, but whether any error occurred which operated to the prejudice of the defendants or unduly affected the outcome. (*Moore v. Jewel Tea Co.*, 116 Ill.App.2d 109, 253 N.E.2d 636.) As in that case, when we consider the evidence which amply supports the jury's verdict, as well as the law applicable to the alleged errors raised here, it is our conclusion that there is no error which would justify a reversal in this case.

■■ Seven-Up next urges that the court erred in giving certain instructions and in refusing certain others. The contentions of error relating to the instructions given on the question of punitive damages have been dealt with earlier in this opinion, and we reaffirm our position that those instructions were proper. It is also asserted that plaintiff's instruction number three was improper because it allowed the jury to "fix the amount of damages which will reasonably compensate the Plaintiff for the damage to its property proved by evidence to have resulted from the wrongful conduct of the Defendant." Since the claim for general damages was limited to the loss of perishable foods, this instruction is argued to have allowed the jury to speculate on damages. We find this to be no ground for reversal, especially since instruction number 15 submitted by Seven-Up informed the jury that if it found for the plaintiff, it "must then fix the amount of money which will reasonably and fairly compensate him for the loss of perishable goods." It should also be noted that

the amount of $12,000 in general damages awarded was quite low based on the evidence presented as to the value of the perishable foods destroyed. We further find no error in the court's determination to refuse Seven-Up's instruction number 9, defining the distinction between an agent and an independent contractor, for reasons sufficiently advanced earlier in this opinion. Nor do we find any ground for reversal in the court's decision to give the full Illinois Pattern Jury Instruction on proximate cause (IPI—Civil § 15.01 (1961)), which included the bracketed section containing the law on concurrent causation. It reads:

> "When I use the expression 'proximate cause', I mean a cause which, in natural or probable sequence, produced the injury complained of. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.]"

We fail to see how this instruction could reasonably have suggested to the jurors that they might find Leviton was not Seven-Up's agent and yet still find Seven-Up liable as is contended. Rather there is merit in plaintiff's response that without the full instruction the jury may have exonerated Seven-Up, even if vicarious liability was established, if it felt that a more immediate cause was the actions of one of the others involved.

■■ Seven-Up finally asserts error in that provisions for both general and punitive damages were included on the same verdict form and not placed on separate forms. This is asserted to have confused the jury by suggesting that it had to find both kinds of damages. We are not in accord. The jurors were orally instructed by the trial judge that they were "not required to find both compensatory damages and punitive damages," and even though "both [were] on the same verdict form" the jurors "need not find punitive damages unless that is your decision."

In view of all the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

ADESKO, P. J., and DIERINGER, J., concur.