JOHN P. SCHMIDT, Plaintiff-Appellant, *v.* HINSHAW, CULBERTSON, MOELMANN, HOBAN AND FULLER *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 78-1058

Opinion filed August 14, 1979.

Richard S. Jalovec and Mathew K. Szygowski, both of Chicago, for appellant.

Philip F. Purcell, Michael I. Miller, Paul Hanzlik and Paul Lembesis, all of Chicago (Isham, Lincoln and Beale, of counsel), for appellees.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Plaintiff, John P. Schmidt, brought this action against defendants, Hinshaw, Culbertson, Moelmann, Hoban & Fuller (Hinshaw), a law firm, and the partners therein, seeking to recover for damages allegedly arising from Hinshaw's representation of plaintiff in and subsequent to the sale of plaintiff's business. Plaintiff essentially alleged that Hinshaw was guilty of malpractice in failing to exercise the requisite care and skill and in representing conflicting interests.

Following extensive discovery, the circuit court of Cook County granted Hinshaw's motion for summary judgment. Plaintiff appeals, contending *inter alia* (1) that the trial court erred in holding expert testimony was required to support plaintiff's case; and (2) that the existence of issues of material fact rendered summary judgment inappropriate. The relevant facts follow.

In 1967, plaintiff asked George S. Hoban, a partner of Hinshaw and an attorney who had previously represented plaintiff, to represent him in the sale of plaintiff's business, Chicago Tabulating Service (CTS), to Data Processing Development Corporation (DPDC). Plaintiff was the principal owner of CTS and a businessman with experience in similar prior transactions. The principal owner of DPDC was Valerie Mills, a woman of substantial independent wealth. Her husband, H. Jefferson Mills, was DPDC's chief executive officer. At this time, Nathaniel Bedford, a New York attorney, represented Mrs. Mills, her husband, and DPDC. Hinshaw, through Hoban, represented plaintiff in the contract negotiations with Bedford, and Hoban participated with Bedford in the drafting of the documents which, after several months, finally set forth the rights and obligations of the parties to the transaction.

In his complaint, plaintiff alleged that he had two primary goals with respect to the sale of his company: first, that he receive "a million dollars"; and second, that the entire million dollars be personally guaranteed. However, in his deposition, plaintiff revealed that he had several other aims: (1) to minimize his Federal income tax liability; (2) to obtain a substantial amount of cash immediately; and (3) to have the option to participate in any appreciation in the value of DPDC that might occur after it purchased CTS.

These considerations in part determined the ultimate structure of the transaction. The actual sale of the company essentially took the form of a stock-for-stock transaction, whereby under the plan and agreement of reorganization, plaintiff would exchange his stock in CTS and eventually receive 295 shares of DPDC stock. Because a stock-for-stock exchange is generally a non-taxable event under Federal tax law, this had the effect of minimizing plaintiff's income tax liability.

Plaintiff's desire for immediate cash resulted in the extension of a loan by Mrs. Mills to plaintiff in the amount of $200,000. In exchange, plaintiff executed a note which stated that if plaintiff defaulted on the loan, the holder of the note could only look for recourse to a portion of the DPDC stock which plaintiff was to receive for his CTS stock, such that plaintiff would not be personally liable for repayment of the loan.

Under the stock retirement agreement, plaintiff had the option of tendering to DPDC up to 25% of his DPDC stock each year beginning October 1, 1969. Stock not tendered in any year could be tendered in a successive year at a higher price, or plaintiff could elect not to tender any DPDC stock at all. Thus, plaintiff had the opportunity to participate in any rise in value in DPDC.

With regard to plaintiff's wish to receive a million dollars for his business, the stock retirement agreement provided that he could tender his 295 shares of DPDC as follows:

| | | |
|---|---|---|
| 10/1/69 | 73 shares at $2970 per share | = $216,810 |
| 10/1/70 | 74 shares at $3240 per share | = $239,760 |
| 10/1/71 | 74 shares at $3510 per share | = $259,740 |
| 10/1/72 | 74 shares at $3780 per share | = $279,720 |
| | total | = $996,030 |

Plaintiff had conceded that this came so close as to meet his goal of receiving a million dollars.

Finally, plaintiff desired that the million dollars he was supposed to receive from DPDC be personally guaranteed. Plaintiff wanted Mrs. Mills to guarantee DPDC's obligation to purchase all four tenders of stock, and Hoban negotiated for just such a complete guarantee. However, Mrs. Mills and her attorney, Bedford, would agree to guarantee payment for only the first three tenders of stock to DPDC. This resulted in a guarantee in an amount which would range from $716,310, if plaintiff made each tender as soon as he could under the agreement, up to $775,710, if he accumulated all the shares until the third tender date. The reason Mrs. Mills and Bedford refused to guarantee more than the first three tenders was because Mrs. Mills had already agreed to advance plaintiff $200,000 on a nonrecourse basis, in a loan secured solely by 74 shares, or one fourth, of plaintiff's DPDC stock, and thus she had already in effect paid plaintiff $200,000 for the last quarter of his stock. As Bedford explained in his deposition, since plaintiff was guaranteed to receive up to $775,710,

"* * * and since Mrs. Mills had already advanced him $200,000, that would make close to the million dollar guarantee, within a very few thousand dollars of it. And if Mrs. Mills had been obliged to purchase the last 25 percent of [plaintiff's] stock, he would have gotten considerably over the million, and I think approximately $280,000 [$279,720], * * *, and he'd simply have turned around and paid her $200,000 and made $80,000 right out of her pocket. So I drew the Stock Purchase Agreement on the basis that she would not agree to purchase the last 25 percent, and thereby increase her liability, and at that point, she put her foot down."

Bedford further stated that this was thoroughly discussed among all the parties. The resulting guarantee agreement accordingly only extended to September 1, 1972, and therefore did not cover the last tender, such that if DPDC defaulted, Mrs. Mills's personal liability was effectively limited to $200,000 of the final tender price of $279,720.

Mrs. Mills's guarantee specifically stated that part of the consideration for the agreement was plaintiff's agreement to work to enhance the development of DPDC and CTS. To that end, plaintiff continued to work for CTS as president after it became a wholly owned subsidiary of DPDC.

Subsequent to 1967, Hinshaw acted as legal counsel to DPDC and CTS in Chicago. Hinshaw represented DPDC in two matters: (1) the purchase of a leasing company, Computerpax, in 1968 or 1969; and (2) the filing of a lawsuit, in 1972, to recover a fraudulently endorsed CTS stock certificate (the McIntosh litigation). Plaintiff had admitted that he knew of and had no objection to Hinshaw's representation of DPDC and CTS in these matters, and that to his knowledge, the representation in no way affected him. It is also apparent from the record that the representation was partially for plaintiff's benefit, as a holder of substantial stock in DPDC, as an officer of CTS, and as a named defendant in a lawsuit that comprised part of the McIntosh litigation.

Meanwhile, the financial position of DPDC had begun to deteriorate. Relations between plaintiff and Mr. and Mrs. Mills became increasingly strained, and plaintiff's performance as an officer of CTS began to be criticized by the Mills. In October of 1969, DPDC refused to repurchase plaintiff's first tender of stock in accordance with the stock retirement agreement, and thereafter, Mrs. Mills refused to honor her guarantee obligation. Both DPDC and Mrs. Mills refused to honor their agreements after every subsequent tender of stock. Hinshaw, through Hoban, thereupon represented plaintiff in negotiations with attorneys for DPDC and Mrs. Mills.

These negotiations extended over several years. Although he vacillated to some extent, plaintiff generally wanted to file a lawsuit against DPDC and Mrs. Mills, but Hoban always dissuaded him. Hoban advised plaintiff that if he brought suit, there might well be a counterclaim against him for breach of his employment agreement. Moreover, plaintiff admitted that there remained the persistent hope that DPDC would be sold, thereby salvaging everyone's original expectations.

During the negotiations, plaintiff consulted formally or informally with several other attorneys. All were of the opinion that a suit should be filed; all also advised plaintiff that Hoban had done a good job in drawing up the documents. Plaintiff was admittedly aware that he could file suit and that he had the option at any time of retaining another law firm to file suit. In fact, in early 1973, plaintiff even drafted a letter to Hoban, which appears in the record and concludes as follows:

> "It is apparent now that after all these years you and your company cannot negotiate a fair settlement for me, and that we will have to sue.
>
> I therefor [*sic*] have made the decision to turn this case over to [another law firm] to handle the suit."

However, plaintiff did not send the letter, and the next day he decided to settle and did settle his dispute with DPDC and Mrs. Mills.

Later in 1973, plaintiff filed the instant action. Plaintiff's second amended complaint essentially alleged that Hinshaw, through Hoban, was guilty of professional malpractice in negligently drafting the repurchase and guarantee agreements, in advising settlement rather than filing or advising a lawsuit, and in representing conflicting interests. Hinshaw answered the second amended complaint and additional discovery ensued. In answer to interrogatories, plaintiff *inter alia* stated that the experts he intended to call at trial had not yet been determined. Approximately one year later in November of 1976, Hinshaw submitted a supplemental interrogatory seeking the names of all plaintiff's expert witnesses. When no expert had been disclosed by February of 1977, Hinshaw presented a motion seeking an order requiring plaintiff to identify his expert witnesses by a definite date and barring any expert witness not so identified from testifying at the trial that was shortly to ensue. The court entered an order requiring both parties to identify, on or before March 31, 1977, all expert witnesses who would testify at trial. Hinshaw submitted a list of its experts, but plaintiff failed to disclose any expert witnesses. Hinshaw then made a motion reciting these facts and requesting that plaintiff be barred from calling any expert witnesses at trial, which motion the trial court granted.

Hinshaw thereupon moved for summary judgment on the ground that plaintiff's cause of action required expert testimony as to the applicable standard of care, but plaintiff was now precluded from presenting any expert testimony by order of court. The motion was also supported by the affidavit of John S. Pennell, an attorney with experience in numerous sales of corporations. The affidavit *inter alia* stated that in the affiant's opinion, the record did not disclose any evidence of negligence on the part of Hoban or Hinshaw and their conduct met the standard of care customarily exercised by attorneys practicing corporate and tax law in the area. The motion also relied on the depositions of plaintiff and Bedford in contending that there was no genuine issue of material fact and that Hinshaw was entitled to judgment as a matter of law. Both parties submitted memoranda of law to the court, but plaintiff's response did not contain opposing affidavits from an expert or anyone else. Rather, plaintiff chose to stand on the pleadings and depositions on file. After hearing argument, the trial court granted Hinshaw's motion for summary judgment. Plaintiff appeals.

■■ Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled a judgment as a matter of law." (Ill. Rev. Stat. 1977, ch. 110, par. 57(3); *e.g., Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 390 N.E.2d

53.) We first consider whether the trial court properly entered summary judgment in favor of Hinshaw on plaintiff's allegations that Hinshaw was negligent in drafting the stock repurchase and guarantee agreements.

The law is well settled that an attorney is liable to his client for damages only when he fails to exercise a reasonable degree of care and skill, and the law distinguishes between negligence and mere errors of judgment. (*Stevens v. Walker & Dexter* (1870), 55 Ill. 151; *Brainerd v. Kates* (1979), 68 Ill. App. 3d 781, 386 N.E.2d 586; *House v. Maddox* (1977), 46 Ill. App. 3d 68, 360 N.E.2d 580.) The question of whether an attorney has exercised a reasonable degree of care and skill is one of fact (*e.g., Brown v. Gitlin* (1974), 19 Ill. App. 3d 1018, 313 N.E.2d 180), and in Illinois the standard of care against which the attorney's conduct will be measured must generally be established through expert testimony. (*Dorf v. Relles* (7th Cir. 1966), 355 F.2d 488; *Brainerd v. Kates*; *Brown v. Gitlin*; *Kohler v. Woollen, Brown & Hawkins* (1973), 15 Ill. App. 3d 455, 304 N.E.2d 677; *Olson v. North* (1934), 276 Ill. App. 457.) However, where "the negligence is so grossly apparent * * * that a layman would have no difficulty in appraising it" (*Bonhiver v. Rotenberg, Schwartzman & Richards* (7th Cir. 1972), 461 F.2d 925, 928, citing, *e.g., Graham v. St. Luke's Hospital* (1964), 46 Ill. App. 2d 147, 158, 196 N.E.2d 355 (medical malpractice)), as where the record discloses such an obvious, explicit, and undisputed breach of the attorney's duty of care as letting the statute of limitations run, expert testimony as to the applicable standard of care will not be required. *House v. Maddox* (1977), 46 Ill. App. 3d 68, 72-73, 360 N.E.2d 580; *cf. Comte v. O'Neil* (1970), 125 Ill. App. 2d 450, 454, 261 N.E.2d 21 (giving examples in the medical malpractice context).

In an attempt both to bring his case within the last stated "common knowledge exception" and to create an issue of material fact which would render summary judgment inappropriate, plaintiff contends that the issue of Hinshaw's negligence turns only on the following questions: Did plaintiff instruct Hinshaw to see that the entire one million dollars was personally guaranteed? Did Hinshaw do this? And if not, did Hinshaw's failure to do so cause injury to the plaintiff? However, we believe plaintiff's characterization is not only a complete oversimplification of the matter before us (see *Brainerd v. Kates* (1979), 68 Ill. App. 3d 781, 786, 386 N.E.2d 586), but is rebutted by the uncontroverted facts in the record. Plaintiff alleges in his complaint and contends in his brief that his only goals and instructions to his attorney with respect to the transaction were that he receive one million dollars and that the entire sum be guaranteed. We agree that an attorney's duty to his client exists in relation to the representation sought by the client and the scope of the authority conferred. (See *Fleener v. Fleener* (1970), 133 Ill. App. 2d 118, 122, 263 N.E.2d 879.) Yet, as revealed by his own deposition, as well as the

depositions of Bedford and Hoban and the affidavit of plaintiff's expert, plaintiff had several other goals which he communicated to his attorney, including his desires to minimize his tax liability, to obtain a substantial amount of cash immediately, and to preserve the opportunity to participate in any growth by DPDC. All these considerations, some partially competing, helped determine the ultimate structure of the transaction, as did the aims of the other parties, of which plaintiff was made aware; yet, plaintiff elected to go ahead with the transaction. The record simply does not bear out plaintiff's contention that there is an issue of fact as to whether his attorney disregarded his instructions in failing to secure a complete guarantee.

Plaintiff's failure to obtain an expert witness further supports the entry of summary judgment in Hinshaw's favor. The common sense of laymen could hardly be relied upon to provide the requisite standard of care for the drafting of the relatively complex, multidocument transaction involved in this case. (*Cf. Chiero v. Chicago Osteopathic Hospital* (1979), 74 Ill. App. 3d 166, 392 N.E.2d 203.) Rather, as the court said in *Brainerd v. Kates* (1979), 68 Ill. App. 3d 781, 786, 386 N.E.2d 586:

> "In a situation of this type, far from demonstrating negligence as a matter of law, the record shows the need for expert testimony in determining whether or not defendant in the case at bar had exercised a reasonable degree of care and skill with due regard to the distinction between errors of negligence and of mistaken legal judgment."

Although plaintiff's action had been on file for more than three years and Hinshaw had been requesting disclosure of plaintiff's experts for 1½ years, and although plaintiff was under court order to produce his experts by a specific date prior to the approaching trial of the cause, plaintiff failed to secure the expert testimony necessary to support his cause of action. Our courts have held that where the plaintiff in a professional malpractice action has had every opportunity to establish his case, but has failed to demonstrate that he could possibly show negligence on the part of the defendant by expert testimony, when the issue clearly cannot be determined by the common knowledge of laymen alone, summary judgment could be allowed. (*Hill v. Lutheran Hospital* (1978), 58 Ill. App. 3d 1003, 1008, 374 N.E.2d 1147; see *Chiero v. Chicago Osteopathic Hospital; Brainerd v. Kates.*) Entry of summary judgment appears particularly appropriate where, as here, the defendant's motion is supported by experts' affidavits or depositions which do establish a standard of care and which state that the defendant's conduct has met that standard. (See *Chiero v. Osteopathic Hospital.*) Plaintiff had the opportunity to present opposing affidavits or other countervailing

material in an attempt to create an issue of fact, yet he failed to do so. In short, plaintiff's bare claim that there is an issue of fact as to Hinshaw's negligence and that such issue can be resolved without resort to expert testimony on plaintiff's behalf is completely rebutted by the record, and therefore the trial court's entry of summary judgment in favor of Hinshaw on the negligence portion of the complaint was proper. If anything, the record reflects that plaintiff was injured, not by any negligence on the part of his attorney, but by the failure to perform on the part of the other parties to the transaction. That plaintiff is a "client disgruntled because of an unfavorable result" is understandable, but it does not necessarily mean that he has an action against his attorney for negligence. *Dorf v. Relles* (7th Cir. 1966), 355 F.2d 488, 492; *cf. Stevens v. Walker & Dexter* (1870), 55 Ill. 151, 153; *Pacelli v. Kloppenberg* (1978), 65 Ill. App. 3d 150, 382 N.E.2d 570; *Mecartney v. Wallace* (1919), 214 Ill. App. 618, 624; *Morrison v. Burnett* (1894), 56 Ill. App. 129.

Plaintiff also argues that Hinshaw was guilty of malpractice in matters occurring subsequent to the drafting of the sale documents. Specifically, plaintiff contends that Hinshaw placed itself in a conflict of interest by representing DPDC and the Mills after representing plaintiff in the initial transaction and prior to representing plaintiff in negotiations arising out of DPDC and Mrs. Mills's breach of their agreements. Plaintiff argues that Hinshaw's representation of DPDC and Mrs. Mills would have subjected Hinshaw to disqualification in litigation against them; that Hinshaw knew this; and that to avoid disqualification, Hinshaw advised plaintiff to settle his claim against DPDC and Mrs. Mills. Plaintiff's argument concludes with the assertion that Hinshaw's failure to withdraw as plaintiff's attorney when litigation against DPDC and Mrs. Mills became a possibility was malpractice.

We are not aware of any case in Illinois holding that an attorney may be guilty of malpractice for representing conflicting interests. Plaintiff has cited only cases involving attorney disqualification (*e.g., Cinema 5, Ltd. v. Cinerama, Inc.* (2d Cir. 1976), 528 F.2d 1384; see Annot., 31 A.L.R.3d 715 (1970)) or attorney discipline. (*In re Williams* (1974), 57 Ill. 2d 63, 309 N.E.2d 579; see Annot., 17 A.L.R.3d 835 (1968).) However, it has been noted that there are some cases in which courts have held an attorney liable for malpractice for representing conflicting interests. (See Annot., 28 A.L.R.3d 389 (1969).) The same annotation comments that though the cases are relatively few, they exemplify just one particular type of legal malpractice, so that all the other principles relevant to malpractice actions generally, such as those relating to the required degree of care and skill, fully apply. (Annot., 28 A.L.R.3d 389, 392 (1969).) If so, unless the conflict were so clear as to be undisputed, expert testimony or some substitute therefor would once again seem to be required, in order to establish the

standard of care applicable to the attorney's decision whether or not to withdraw.

■■ In any event, we need not decide these questions here, for even assuming that a conflict of interest can be a basis for a malpractice action, and even assuming that expert testimony on behalf of the plaintiff would not be required, plaintiff has failed to establish that there is an issue of fact as to the existence of a conflict of interest in the case at bar. Hinshaw represented only plaintiff in the negotiations leading to the repurchase and guarantee agreements and in the negotiations arising out of DPDC and Mrs. Mills's breach of those agreements; on each occasion, DPDC and Mrs. Mills had counsel of their own. As to Hinshaw's representation of DPDC on two brief occasions in the interim, with plaintiff's knowledge and consent, there are no facts in the record or even allegations in the complaint to support the contention that these matters were in any way related to either sets of negotiations in which Hinshaw represented plaintiff, or that any confidential information relevant to those negotiations might have been disclosed. Thus, whether we apply the "substantially related" test discussed in a line of recent Seventh Circuit Cases (*e.g.*, *Westinghouse v. Gulf Oil Corp.* (7th Cir. 1978), 588 F.2d 221) or the "closely related" test first formulated in *People v. Gerold* (1914), 265 Ill. 448, 477-78, 107 N.E. 165, and apparently still the rule in Illinois today (see, *e.g.*, *People v. Coslet* (1977), 67 Ill. 2d 127, 364 N.E.2d 67; *In re Williams* (1974), 57 Ill. 2d 63, 309 N.E.2d 579), we cannot find that there exists any issue of fact as to the existence of a conflict of interest. Rather, once again, plaintiff's bare claim of a conflict cannot stand in light of the uncontroverted facts appearing in the depositions and affidavit submitted. Hinshaw was therefore entitled to judgment as a matter of law.

In view of the facts presented in the instant case, we are compelled to conclude that the trial court properly entered summary judgment in favor of Hinshaw and against plaintiff. Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING and HARTMAN, JJ., concur.