JAMES G. YORK *et al.*, Plaintiffs-Appellees, *v.* JOHN C. STIEFEL, Defendant-Appellant.

Third District   No. 81—89

Opinion filed September 23, 1982.

Lyle W. Allen and Gary D. Nelson, both of Heyl, Royster, Voelker & Allen, of Peoria, for appellant.

Richard D. Price, Jr., of Cassidy, Cassidy, Mueller & Price, of Peoria, for appellees.

PER CURIAM: Plaintiffs, James and Janis York, and Lawrence and Donna LaCroix, brought an action at law against the defendant, John C. Stiefel, an attorney, to recover damages allegedly arising from the legal malpractice of the defendant. A circuit court jury of Peoria County returned verdicts in favor of Donna LaCroix ($15,000), James York ($5,000), and Janis York ($5,000), but was unable to reach a verdict as to plaintiff Lawrence LaCroix. The trial court entered judgment on the three verdicts and declared a mistrial as to the remaining plaintiff, who ultimately moved for a voluntary dismissal of his complaint, which was granted.

On appeal the defendant presents two issues for review: (1) whether the expert testimony elicited by plaintiffs was sufficient to sustain their burden of proving that defendant breached the standard of care of an attorney and whether the damages claimed by plaintiffs were the proximate result of legal malpractice, and (2) whether the evidence established the existence of an attorney-client relationship between plaintiffs Donna LaCroix and Janis York and the defendant.

The factual context from which the cause of action arose is as follows.

In 1974, plaintiffs Lawrence LaCroix and James York consulted a Chicago attorney, John Stiefel, with regard to the purchase of a Porsche-Audi dealership in Peoria, Illinois. Stiefel had become ac-

quainted with York in 1972 when York was selling cars for another Porsche-Audi dealership in Winnetka, Illinois. York suggested Stiefel as an attorney to his partner, LaCroix, when counsel was needed to organize their business.

Stiefel suggested a Subchapter S corporate arrangement and performed the legal work to incorporate Countryside Porsche-Audi, Inc. (hereinafter referred to as Countryside). Lawrence LaCroix was president and handled the bookkeeping, bank loans, payroll and general administrative tasks of the corporation. York served as vice-president and was in charge of marketing new and used automobiles. Stiefel served as assistant secretary and registered agent for the corporation throughout its existence. Neither Donna LaCroix, Lawrence's wife, nor Janis York, James' wife, were employed by the corporation or officers of the corporation.

The corporation was capitalized by means of a capital loan of $50,000 from York's father, a capital loan from the Jefferson Bank (hereinafter Bank) of $75,000, and a floor plan agreement with the Bank. The limit on this floor plan loan was set at a later date at $275,000. Plaintiffs Lawrence LaCroix and James York each paid $500 in return for 500 shares of $1 par value stock.

The $75,000 capital loan from the Bank to Countryside was accompanied by a guarantee from the Small Business Administration (hereinafter SBA), which assured the Bank a repayment of any unpaid balance which might be forfeited by the financial failure of Countryside. The SBA obtained the personal guarantees of all four plaintiffs to reimburse the SBA for any funds which it might expend by virtue of a default by Countryside.

The floor plan loan to Countryside enabled the company to maintain a steady supply of inventory. The Bank paid the manufacturer or distributor for the cars ordered by Countryside and, in return, took a security interest in each vehicle. When a car was sold, Countryside was obliged to remit to the Bank the amount of its secured interest. Failure to remit these funds following a sale created a potential criminal liability for corporate officers under section 9—306.01 of the Uniform Commercial Code, a Class 3 felony (Ill. Rev. Stat. 1979, ch. 26, par. 9—306.01(2)(3)(4)). Penalties could include an order for restitution and a jail sentence. There was no personal guarantee from the individual plaintiffs to the Bank on the floor plan loan.

By virtue of the cross-collateral clauses in both loans from the Bank to Countryside, the Bank would, in the event of a default, allocate the proceeds from the sale of collateral to the unguaranteed loan first, in order that any unpaid and unreimbursed principal would be

returned to the Bank under the SBA guarantee.

Stiefel did not participate in negotiations for the loan from York's father, the $75,000 capital loan from the Bank, the SBA guarantee, or the increase in the floor plan loan. Stiefel did assist in the negotiations concerning the initial floor plan loan, although he was not present when the final documents on that loan were signed.

With the initial capital loans, the assets for the new dealership were purchased from the Bank which had held them as principal creditor of the previous Porsche-Audi dealer, which had failed in the same market.

Stiefel counseled the plaintiffs as individuals prior to their move to Peoria in 1974. In early 1973 he represented York on a traffic ticket. He also assisted the LaCroix' and York's in the sale of their houses prior to their move to Peoria in 1974. After the plaintiffs had taken up residence in Peoria, he never spoke to Donna LaCroix or Janis York and spoke to LaCroix and York only as to matters relating to Countryside.

In January 1976, the Bank discovered that Countryside was selling secured vehicles without remitting to the Bank the value of its secured interest. Neither LaCroix nor York disputed that they had sold cars without honoring their trust agreement with the Bank. On February 6, 1976, the Bank, having already frozen the personal savings accounts of the plaintiffs, sent a personal representative to Countryside's place of business and advised that the Bank intended to foreclose Countryside at the close of business that day unless it received personal assurances in the form of second mortgages on the homes of LaCroix and York. Lawrence LaCroix called John Stiefel and arranged to meet with him in Chicago that day. He saw Stiefel immediately upon arriving at his offices and was with him approximately eight hours.

Following extensive phone conferences with Bank personnel and the Bank attorney, Stiefel recommended to LaCroix that he execute the second mortgage and release his personal savings accounts to the Bank. He gave the same advice to York via the telephone. He did not advise either Donna LaCroix or Janis York to sign the second mortgages or release their personal savings accounts.

Stiefel testified that he was advised by a Bank officer that the Bank possessed a personal guarantee on the floor plan loan. The Bank attorney mentioned to Stiefel on the telephone that criminal exposure was possible for both LaCroix and York and that the Bank wanted to prosecute. Mr. Young, the Bank attorney, corroborated that he had informed Mr. Stiefel of the possible criminal exposure of LaCroix and

York, but could not remember whether he had or had not indicated the desire to prosecute. Young did not recall having said that the Bank had a personal guarantee on the floor plan, nor did he recall overhearing Bank personnel make such a representation.

LaCroix confirmed that he was advised of his possible criminal exposure for selling cars out of trust and that Stiefel could not find the copies of the personal guarantees the Bank was claiming it had, although he thought he recalled it. LaCroix inquired of the feasibility of a Chapter 11 bankruptcy and testified that Stiefel advised him that the Bank, as secured creditor, would not allow such a reorganization. Attorney Paul Cation, testifying as an expert witness, confirmed that that was correct, and no testimony was offered that it was incorrect.

Stiefel testified that in his judgment, the advice he gave was the best alternative for LaCroix and York, given the possibility of criminal charges being filed against them as officers of a corporation which could have resulted in jail terms plus restitution of the amount withheld from the Bank. This remedy allowed Countryside to continue operating in a normal fashion for an additional 30 days while they sought substitute financing and enabled them to sell assets in a non-distress situation, thereby providing them an opportunity to realize a greater profit. Both LaCroix and York wanted to continue to operate the dealership.

Stiefel further testified that executing these documents may have lessened the economic blow to LaCroix and York since the Bank, by its ability to allocate proceeds from the sale of collateral, could have applied all available funds to satisfy the unsecured floor plan loan, leaving the balance of the SBA loan to be repaid to the SBA by the plaintiffs personally pursuant to their personal guarantee. This procedure was confirmed by the testimony of attorney Cation as good advice to the client and what a reasonably careful lawyer would have advised under the circumstances.

Second mortgages were executed by the plaintiffs for $54,600 representing the amount Countryside was out of trust and overdrawn on its corporate bank account. This constituted a paper transaction by which the Bank loaned the deficiency to the individuals. The Bank was secured by the mortgages and the deficit was contributed to the capital of the corporation, allowing the corporation to meet its obligations. Neither York nor LaCroix disputed the fact that they had sold cars without honoring their trust agreement. Subsequent attempts by Countryside to obtain refinancing were unsuccessful, and the Bank foreclosed on the second mortgages executed by plaintiffs.

The plaintiffs filed suit alleging that the legal malpractice of John

Stiefel had proximately caused them damage in that they personally assumed a corporate obligation.

At trial, plaintiffs presented expert testimony of Peoria attorneys James Brannon and Hollis Benjamin in support of their claim. Defendant presented Peoria attorney Paul Cation as an expert witness for the defense.

Attorney Brannon testified, in response to a hypothetical question, that it was poor judgment to render advice without consulting actual documents relating to personal guarantees. He testified that it was not good judgment to advise that bankruptcy was not an available remedy to plaintiffs in the absence of experience in that field. He felt that some other course of conduct should have been taken by the lawyer. He further testified that before considering bankruptcy, the desire of the debtors to liquidate their business themselves was a valid factor to consider in recommending a course of action.

Hollis Benjamin testified that in his opinion the attorney violated the prevailing standard of care in failing to consult documents and in relying on his memory in giving advice on those documents. He was unable to state, however, that had such an examination of the documents occurred it would have made any difference. He further testified that the question of what advice should be given in these circumstances is a matter of judgment.

Paul Cation testified in response to a hypothetical question that the lawyer exercised a reasonable degree of care and skill in advising his client and that he was not negligent in giving the advice and consultation; that bankruptcy would not have helped the individuals under any circumstances; and that it was not negligence to advise them to secure the amount they were out of trust and overdrawn by a second mortgage on their homes. He testified that even the possibility of a criminal record for one's clients would be a paramount consideration for the careful attorney in rendering advice. In addition, Cation stated that the personal guarantee on the SBA loan jeopardized their personal assets due to the Bank's ability to apply proceeds from the sale of assets to pay off its own obligations first.

Turning to the issue presented for review, we believe the initial inquiry must resolve the question of the scope of appellant's representation of all the plaintiffs. On appeal it is alleged that the plaintiffs failed to establish an attorney-client relationship vis-a-vis Janis York and Donna LaCroix on the one hand and the appellant on the other.

■■ The initial element in a cause of action for negligence is to show the existence of a duty running from the defendant to the plaintiff. (*Mick v. Kroger Co.* (1967), 37 Ill. 2d 148, 224 N.E.2d 148.) In

attempting to establish a claim for legal negligence, this duty may be shown by establishing the existence of an attorney-client relationship with respect to the subject matter of the services performed by the attorney. (*Bloomer Amusement Co. v. Eskenazi* (1979), 75 Ill. App. 3d 117, 394 N.E.2d 16.) The attorney-client relationship is consensual and arises only when both the attorney and the client have consented to its formation. The attorney-client relationship is essentially one of principal and agent to which the general rules of agency law apply. (*Westinghouse Electric Corp. v. Rio Algom Ltd.* (N.D. Ill. 1978), 448 F. Supp. 1284; *Flight Kitchen, Inc. v. Chicago Seven-Up Bottling Co.* (1974), 22 Ill. App. 3d 558, 317 N.E.2d 663.) The client must manifest his authorization that the attorney act on his behalf and the attorney must indicate his acceptance of the power to act on the client's account. *Westinghouse Electric Corp. v. Rio Algom Ltd.* (N.D. Ill. 1978), 448 F. Supp. 1284, 1300, quoting from the Restatement (Second) of Agency sec. 15 (1958).

The breadth of the duty from the attorney to the client is measured by the representation sought by the client and the scope of the authority conferred on the attorney by the client. *Schmidt v. Hinshaw* (1979), 75 Ill. App. 3d 516, 394 N.E.2d 559.

The duty to exercise due care and diligence incident to the attorney-client relationship terminates when the attorney-client relationship terminates (*Dolce v. Gamberdino* (1978), 60 Ill. App. 3d 124, 376 N.E.2d 273), or when the services for which the attorney was retained are completed (*People v. Wos* (1946), 395 Ill. 172, 69 N.E.2d 858).

In the case at bar, the one and only time Stiefel represented Donna LaCroix or Janis York was in 1974 when they were selling their homes to move to Peoria. That relationship terminated upon completion of the transactions.

Donna LaCroix testified that she had never spoken with Stiefel and that the Bank officer had interpreted the documents for her on February 6, 1976, when she had questions. Janis York had met John Stiefel on only one occasion at lunch while they lived in Chicago, and couldn't recall any legal topics during the conversation. She also relied on the Bank officer for answers to any questions she may have had concerning the documents evidencing the second mortgage. It is undisputed that John Stiefel never advised these women to sign nor was he ever asked by them concerning the wisdom of executing those documents.

Stiefel did not represent Donna LaCroix or Janis York when they purchased their homes in Peoria. He did not represent them when

they signed a personal guarantee on a SBA loan being taken out by their husbands. They did not call him when their accounts were frozen prior to February 6, 1976. The did not call him on February 9, 1976, when their husbands and Bank personnel were advising them to sign the documents.

Both women have alleged in their complaint that John Stiefel was their personal attorney on February 6, 1976. There is no evidence in the record that they ever communicated to John Stiefel their desire that he represent them or that he accepted. There is no evidence in the record that John Stiefel was aware that his advice was to be followed by Donna LaCroix and Janis York. In the absence of such evidence, they did not establish the requisite consensual relationship necessary to hold Stiefel responsible for any advice given to their husbands as officers of the corporation.

■ For the foregoing reasons we believe there was insufficient evidence introduced at trial to establish the existence of the requisite attorney-client relationship between Janis York and Donna LaCroix and the appellant to support a verdict returned for legal malpractice.

Assuming *arguendo* that there was sufficient evidence in the record for the trier of fact to conclude that an attorney-client relationship existed between Janis York and Donna LaCroix and the appellant, the issue remains whether or not there was sufficient expert testimony presented by all the plaintiffs to sustain their burden of proving (a) that defendant breached the standard of care, and (b) whether the damages claimed by plaintiffs were the proximate result of legal malpractice.

Plaintiffs alleged that the defendant was negligent (1) in advising them to personally guarantee a corporate obligation without consulting certain documents before giving his advice, and (2) failing to advise plaintiffs to seek a bankruptcy option as a possible solution to their financial problems.

■ Such allegations required expert testimony to assist the jury in evaluating Stiefel's conduct as the case involved a complex financial arrangement coming apart in a crisis situation with different and competing considerations impinging on the attorney's exercise of judgment. (See *Schmidt v. Hinshaw* (1979), 75 Ill. App. 3d 516, 394 N.E.2d 559.) Plaintiffs offered expert testimony, but the only testimony which purported to show a deviation from the standard of care of a reasonably prudent attorney was directed to the proposition that failing to consult documents is negligence, but even that was accompanied by an admission that the expert could not predict that the result would have been different had the documents been consulted.

Plaintiffs' experts testified only that the manner in which the advice was rendered was an error of judgment. They went on to say that while Stiefel may not have complied with the standard of care, it could not be predicted that compliance with the supposed standard of care would have made any difference. No expert testimony was offered that the advice given was wrong or negligent or that the damage suffered was proximately related to the advice given. In contrast, Paul Cation, an expert witness for the defendant, testified not only that the advice given was correct and in accordance with the prevailing standard of care, but that the basis for giving the advice was sound and valid in light of the circumstances in which the plaintiffs presented themselves. Plaintiffs' own expert testimony was therefore inadequate to support a jury verdict for professional negligence.

■■ An attorney is not liable for matters resting within his judgment, notwithstanding that the exercise of that judgment may have occasioned an unfavorable result for the client. (*Stevens v. Walker* (1870), 55 Ill. 151; *House v. Maddox* (1977), 46 Ill. App. 3d 68, 360 N.E.2d 580.) Attorneys are not obligated by the law to serve as guarantors of their judgment opinions. *McCartney v. Wallace* (1919), 214 Ill. App. 618.

Furthermore, the mere fact that one professional may choose to utilize different procedures than those implemented by the defendant does not support an inference that the defendant was unskillful or negligent. The plaintiffs do not discharge their burden of proof merely by presenting expert testimony which offers an opinion as to correct procedure or which suggests, without more, that the witness would have conducted himself differently than the defendant. The expert must base his opinion upon recognized standards of competency in his profession. A difference of opinion between acceptable but alternative courses of conduct is not inconsistent with the exercise of due care. *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279; *Ybarra v. Cross* (1974), 22 Ill. App. 3d 638, 317 N.E.2d 621.

Attorneys are retained to exercise their judgment on behalf of their clients in areas where there are no sure and definite answers and attorneys cannot always determine future courses of action by precise mathematical equations. Criticism in hindsight of one of many courses of action is not probative of negligence and the mere opinion by a particular attorney that the defendant's course of action is not the same as that which the expert might have chosen is not testimony probative of malpractice. The issue in any professional negligence case is whether or not the actual advice that was given or the act performed was an act which should not be performed by a reasonably

prudent professional in the area where the defendant practices.

██ Attorney Hollis Benjamin offered additional expert testimony on behalf of the plaintiffs. In contrast to the testimony of James Brannon, Benjamin did testify that, in his opinion, a reasonably prudent attorney would not have relied upon his memory or would not have relied upon what opposing counsel may have told him, but would in fact have examined documents prior to giving advice requested on those documents. However, whatever probative value such testimony may have had was negated when Benjamin went on to testify that he could not say that an examination of the documents would have made any difference. No testimony was offered that there was a causal relationship between the only alleged act of negligence supported by expert testimony and the damages suffered by plaintiffs.

Negligence and damages are twin concepts, and as such, the plaintiffs had the burden to plead and prove not only that their attorney was negligent, but that the alleged negligence was the proximate cause of their damages. (*Miller v. Shultz* (1977), 53 Ill. App. 3d 721, 368 N.E.2d 1141.) Failure to prove proximate cause is a failure to prove a *prima facie* case, and submission of such a case to the jury is only an invitation to the jury to ·speculate on the matter. *DeKoven Drug Co. v. First National Bank* (1975), 27 Ill. App. 3d 798, 327 N.E.2d 378; *Central Illinois Light Co. v. Stenzel* (1963), 44 Ill. App. 2d 388, 195 N.E.2d 207.

The record amply supports Mr. Benjamin's reluctance to go farther than suggesting that Stiefel should have consulted the loan documents since even had it been discovered that the personal guarantee was absent, there existed other reasons to advise the corporate officers to make good their debt to the corporation and the Bank. The desires of York and LaCroix to liquidate the business themselves and receive a greater return of the sale of the assets than they would have had at a sheriff's sale was testified as a valid consideration by Brannon. As both Stiefel and Cation stated, a paramount consideration in this matter was whether the corporate officers could escape criminal sanctions which could be imposed for converting the proceeds from the sale of secured goods to their own use rather than that of their secured creditors. Neither corporate bankruptcy nor walking away from the business would have eliminated their potential criminal exposure and arguably would have only increased the creditor's desire to prosecute. Removal of potential liability is a valid consideration in rendering any advice to a client.

██ The expert testimony offered by the plaintiffs in their cause in order to establish the claim of professional negligence was insuffi-

cient to allow this cause to be presented to the jury.

The fact that plaintiffs' experts were unable to testify that had the defendant chosen an alternative course of action the result would have been different negates the requisite proximate cause which must exist for a recovery to occur.

For the reasons set forth the judgments of the circuit court of Peoria County are reversed.

Reversed.

ALLOY and HEIPLE, JJ., took no part in the consideration or decision of this case.