Steven S. SCHOLES, as Receiver for D & S Trading Group, Ltd., Analytic Trading Systems, Inc., Analytic Trading Service, Inc., and Market Systems, Inc., and on behalf of a class, and John LaVinka and Pamela LaVinka, individually and on behalf of all persons similarly situated, Plaintiffs,

v.

STONE, McGUIRE AND BENJAMIN, Howard L. Stone, Michael L. Siegel, Rosenthal and Schanfield, P.C., William P. Rosenthal, and Leslie J. Weiss, Defendants.

No. 90 C 7201.

United States District Court,
N.D. Illinois, E.D.

March 25, 1992.

Gary L. Prior, Paul J. Kozacky, McDermott, Will & Emery, P.C., Jerrold E. Salzman, Phillip Leon Stern, Sherman Paul Marek, Robert P. Scales, Freeman, Freeman & Salzman, P.C., Chicago, Ill., for plaintiffs.

Howard Michael Pearl, Dan K. Webb, Catherine W. Joyce, Winston & Strawn, Daniel J. Pope, Maureen Ann Gorman, Alexander S. Vesselinovitch, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

In this case, defendants Stone, McGuire & Benjamin ("SMB"), Howard L. Stone ("Stone"), a partner of SMB, Michael L. Siegel ("Siegel"), a non-equity partner of SMB, Rosenthal & Schanfield, P.C. ("R & S"), William P. Rosenthal ("Rosenthal"), a senior shareholder of R & S, and Leslie J. Weiss ("Weiss"), an attorney employed by R & S have filed separate motions to dis-

miss plaintiffs' complaint.[1]  In addition, SMB filed a separate motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure against Gary L. Prior ("Prior") and his client, the Receiver, Steven S. Scholes ("Scholes").  For the reasons outlined below, the court denies SMB's motion to dismiss and motion for sanctions.  In addition, the court grants R & S' motion to dismiss Count VII, but denies the motion with respect to Counts V, VI, VIII and IX.

## I.  BACKGROUND

This action is brought by Scholes, not individually but solely as Receiver ("Receiver") for D & S Trading Group, Ltd. ("D & S"), Analytic Trading Systems, Inc., Analytic Trading Service, Inc., and Market Systems, Inc., and by John and Pamela LaVinka, individually and on behalf of a putative class of investors in D & S, Analytic Trading Systems, Inc. and Analytic Trading Service, Inc., (collectively "plaintiffs"), against defendants SMB, Stone, Siegel, R & S, Rosenthal and Weiss.[2]  This action arises out of certain fraudulent schemes perpetrated by Michael S. Douglas ("Douglas"), for which Douglas pleaded guilty and is currently incarcerated.  Plaintiffs assert civil causes of action against the attorneys who allegedly assisted Douglas in carrying out his illegal schemes.

Plaintiffs' complaint, as amended, consists of nine counts.  Plaintiffs have asserted claims for legal malpractice-negligence against SMB (Count I) and R & S (Count V), and breach of fiduciary duty against SMB (Count II) and R & S (Count VI).  In addition, the putative class has alleged claims for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa ("Exchange Act") and Rule 10b–5 promulgated thereunder against SMB (Count III) and R & S (Count VIII), violations of Section 12(2) of the Securities Act

---

1.  For ease of discussion, throughout this opinion we have referred to SMB, Siegel and Stone collectively as SMB.  Similarly, we have referred to R & S, Rosenthal and Weiss collectively as R & S.

2.  By way of background, on July 26, 1991, this court disqualified Scholes from acting as class

representative and attorney for the class and disqualified McDermott, Will & Emery from representing the account holder class in this case.  On August 13, 1991, this court granted Freeman, Freeman & Salzman leave to appear as counsel for class plaintiffs John LaVinka and Pamela LaVinka.

of 1933, 15 U.S.C. § 77v ("Securities Act") by R & S (Count VII), and common law fraud against SMB (Count IV) and R & S (Count IX).

Defendants SMB, Stone, and Siegel (collectively "SMB") have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Similarly, defendants R & S, Rosenthal, and Weiss (collectively "R & S") have moved to dismiss the amendment to the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and for lack of supplemental jurisdiction.

## II. PROCEDURAL HISTORY

Before the court addresses the objections of SMB and the arguments of R & S, a clarification of the procedural posture of this case is in order. Initially, on or about December 12, 1990, plaintiffs filed a four-count complaint against defendants SMB, Stone and Siegel alleging attorney malpractice-negligence (Count I), breach of fiduciary duty (Count II), violation of Section 10(b) of the Exchange Act (Count III), and common law fraud (Count IV). In response, the SMB defendants filed a motion to dismiss. This motion to dismiss was referred to Magistrate Judge Weisberg for a Report and Recommendation.

Thereafter, on April 25, 1991, this court granted plaintiffs' emergency motion to amend their complaint to add R & S, Rosenthal, and Weiss as party defendants. This pleading was styled "Amendment to Complaint" and asserted five additional counts against the R & S defendants. Not surprisingly, R & S moved to dismiss the amendment to the complaint based on grounds similar to those raised by SMB.

After plaintiffs filed their amendment to complaint, Magistrate Judge Weisberg filed his report dated June 27, 1991, recommending that SMB's motion to dismiss all four counts be denied. On May 21, 1991, before the Magistrate Judge issued his report, this court enlarged the referral to Magistrate Judge Weisberg to include R & S' subsequently filed motion to dismiss. However, on June 27, 1991, Magistrate

Judge Weisberg issued his report without addressing R & S' motion to dismiss.

To further compound the confusion, the referral to Magistrate Judge Weisberg was transferred by order of the executive committee on October 10, 1991 to Magistrate Judge Pallmeyer.[3] Due to the similar causes of action and underlying facts regarding both defendants, and in order to foster a legally consistent determination, the referral to Magistrate Judge Pallmeyer was withdrawn by this court on February 11, 1992.

Unfortunately, this does not end the procedural morass. To further complicate matters, after the motions to dismiss were apparently fully briefed, all parties submitted supplemental briefs. As an initial matter, on July 25, 1991, this court granted plaintiffs leave to file a surreply memorandum in opposition to R & S' motion to dismiss. Thereafter, in a letter to Magistrate Judge Weisberg dated September 13, 1991, R & S cited as supplemental authority the Fourth Circuit's recent decision in *Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir.1991). Not surprisingly, on September 27, 1991, SMB messengered a similar letter to this judge also referring to the *Schatz* decision.

This did not end the supplemental briefing. On January 3, 1992, R & S cited as supplemental authority the recent Illinois Supreme Court decision of *Collins v. Reynard*, 1991 WL 220561, 1991 Ill. LEXIS 104 (Oct. 31, 1991), and argued that based on *Collins*, plaintiffs are precluded from maintaining a claim for attorney malpractice under a tort theory of negligence (Count V) and breach of fiduciary duty (Count VI). In turn, plaintiffs responded to R & S' citation to *Collins* with their own letter to Magistrate Judge Pallmeyer dated January 16, 1992. On January 23, 1992, Magistrate Judge Pallmeyer granted R & S leave to file a reply in support of their position on the *Collins* case on or before February 6, 1992. Plaintiffs were also granted leave to

---

**3.** On October 11, 1991, Magistrate Judge Weisberg entered an order transferring the referral

in this case to the calendar of Magistrate Judge Pallmeyer.

file a surreply memorandum on or before February 13, 1992. Both plaintiffs and R & S filed timely briefs on this point.

In sum, after considering Magistrate Judge Weisberg's Report and Recommendation (as it relates to SMB), SMB's objections, plaintiffs' response, and the parties' underlying briefs, we adopt the report and deny SMB's motion to dismiss. Similarly, after having carefully considered the numerous briefs filed by both R & S and plaintiffs, we grant R & S' motion to dismiss Count VII and deny R & S' motion to dismiss Counts V, VI, VIII and IX. Against this backdrop, we now address SMB's objections to the report. Thereafter, we consider R & S' arguments.

### III. FACTS

The standards to be applied in deciding a motion to dismiss are straightforward and beyond dispute. "[U]nless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," we will not dismiss the complaint. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Furthermore, in ruling on the defendants' motions to dismiss, the court accepts all well-pleaded allegations of plaintiffs' complaint as true and views these allegations in the light most favorable to plaintiffs. *Bethlehem Steel Corp. v. Bush*, 918 F.2d 1323, 1326 (7th Cir.1990). Guided by these standards, we now address the facts as set forth in plaintiffs' amendment to the complaint.[4]

On or about March 4, 1988, the Illinois Securities Department ("the ISD") began investigating Douglas and D & S for selling unregistered securities. On that same date, Douglas retained Weiss (who was not yet employed by R & S) to represent Douglas and D & S in connection with the ISD investigation. Even before she was officially retained by Douglas, Weiss was aware of Douglas' past criminal history and lack of income. Shortly after she began her representation of Douglas and D &

S, Weiss learned of further wrongdoing by Douglas including, but not limited to, his distributing misleading offering materials to actual and potential investors which contained material misrepresentations and omissions. These misrepresentations included affirmative statements that substantial profits were made by Douglas, and his partner Lawrence L. Schroeder, Jr. ("Schroeder"), at a time when they were both in jail, and that Douglas personally guaranteed the investments.

These were not the only misrepresentations of which Weiss was aware. Weiss also learned in March, 1988 that Douglas failed to disclose his criminal activities in the D & S offering materials. In light of these discoveries, Weiss recommended in early March, 1988, that Douglas make a "rescission offer" to all D & S investors who were Illinois residents. To this end, Weiss drafted the documents used by Douglas to implement the rescission offer. These documents did not contain the facts that Douglas was a convicted felon and that the original offering materials used to induce the original investments in D & S were fraudulent. Rather, the D & S investors were lead to believe that the reason for the rescission offer was the fact that the interests in D & S were not registered. Copies of the rescission offer were mailed to all D & S investors who were Illinois residents. The rescission offer was made in or about April, 1988. All Illinois investors responding to the rescission offer rejected it.

The ISD was not the only governmental entity investigating D & S. In or about April or May, 1988, Wisconsin and federal government securities officials began investigating D & S. As a result, Weiss' representation of D & S was enlarged to include these new investigations and she recommended in or about April, 1988, that Douglas make a rescission offer to all D & S Wisconsin investors. Once again, Weiss drafted the documents used to implement the Wisconsin rescission offer which, like

---

**4.** The relevant facts as they relate to SMB are fully and accurately set forth in Magistrate Judge Weisberg's report. (Report and Recommendation, pp. 2–7.) This judge will not restate those facts except to the extent necessary to reach its conclusions.

the Illinois rescission offer documents, failed to include Douglas' criminal history and failed to state that the original D & S offering materials were fraudulent. Instead, the Wisconsin D & S investors were falsely lead to believe that the only material fact which necessitated the rescission offer was D & S' failure to register its interests. Copies of the rescission offer were mailed to all D & S investors who were Wisconsin residents. All the Wisconsin investors who responded rejected the offer. In or about late April, 1988, Weiss became employed as an attorney at R & S.

Weiss was aware of additional fraudulent conduct on Douglas' part. Weiss drafted Douglas' affidavit which falsely stated that no one other than Douglas solicited investors for D & S. Weiss prepared the affidavit based on information obtained from Douglas. Weiss knew that the Douglas affidavit was tendered to the ISD on or about March 28, 1988, in connection with its ongoing investigation. The affidavit was false in that Douglas was not the only individual soliciting investors for D & S. Schroeder was also soliciting investors.

To further exacerbate matters, Douglas' lies about D & S caused Weiss to send a letter on or about April 11, 1988 to the State of Wisconsin which contained materially false representations. The letter falsely stated that Douglas was the only person soliciting Wisconsin residents to invest in D & S. The April 11, 1988 letter also falsely represented that Schroeder, Patrick Grady and John Hunter were not representatives of D & S. On or about April 11, 1988, Douglas admitted to Weiss that he had lied to her about Schroeder's involvement. Consequently, Weiss corrected her letter submitted to the Wisconsin authorities. The complaint alleges that Weiss did not withdraw or correct the affidavit submitted to the ISD.

Douglas also lied to Weiss about the formation of D & S. Douglas told Weiss that an attorney drafted the D & S partnership agreement and filed a certificate of limited partnership on behalf of D & S. Obviously not taking Douglas at his word, Weiss spoke with that attorney on or about April 5, 1988. During this conversation, the attorney denied drafting the D & S partnership agreement or submitting any certificate of limited partnership to the Illinois Secretary of State. In addition, the attorney also told Weiss that Douglas had been previously advised that the D & S documentation was not legal. Weiss relayed Douglas' false story about the other attorney's involvement to the ISD. However, even though she knew Douglas' version of events was incorrect, Weiss never corrected the information sent to the ISD.

Weiss' knowledge of Douglas' illegal activity continued. By no later than April 11, 1988, Weiss knew that Douglas was trading securities on behalf of one or more other persons. She also knew that it was illegal for Douglas, or any other company of which he was an officer or director, to trade on behalf of any other person or otherwise deal in securities. In late April, 1988, Weiss told Douglas that she would no longer represent him in matters other than the pending ISD and Wisconsin investigations. She said that she curtailed her representation of Douglas because he was not being honest with her. Notwithstanding her assertions, Weiss continued doing corporate, securities, and transactional work for Douglas and his entities after April, 1988.

In mid-May, 1988, Weiss recommended that Douglas retain SMB as co-counsel to represent Douglas and D & S. She apparently made this recommendation because she knew of Douglas' criminal activity in relation to the sale of D & S' securities.

Throughout the period that D & S was in business, Douglas diverted approximately $2,000,000 in funds that D & S had obtained from investors to satisfy his own personal expenses. Moreover, in classic pyramid scheme fashion, Douglas was taking the monies supplied by new investors and giving those funds to earlier investors with the false representation that the distributions were trading profits. In actuality, Douglas was losing money, not making profits, as he claimed. The bottom line result of Douglas' activity was that D & S did not have enough money to satisfy its

then anticipated obligations under the Illinois and Wisconsin rescission offers which were still outstanding.

The accumulation of Douglas' activities resulted in a meeting on or about June 1, 1988, in which Weiss, Douglas, and attorneys from SMB agreed that, due to D & S' legal problems, D & S should be liquidated and the investors' money returned. At that time, Douglas informed his attorneys that he intended to "stay in business." Before returning the investors' money, however, Douglas met with Weiss and attorneys from R & S to obtain advice on how he could continue to raise money from investors to continue trading. In or about late September 1988, Douglas sent checks to all D & S investors in amounts purporting to represent the investors' principal plus trading profits. Unfortunately for the investors, there were no trading profits.

Instead, the money to fund the liquidation came from another Douglas entity, AT Systems, which was a new trading partnership engaged in activities similar to D & S. Douglas created Analytic Trading Systems, Inc. in August, 1988 to be the general partner of AT Systems. Douglas was the corporation's original president and registered agent. Weiss and R & S knew that AT Systems could not lawfully engage in the sale of securities if Douglas continued as president, owner, and registered agent of Analytic Trading Systems, Inc. Nevertheless, in September, 1988, Weiss and R & S began restructuring Analytic Trading Systems, Inc. and AT Systems with the purpose and objective of making AT Systems viable as a vehicle for the sale of securities.

To further this end, Weiss and R & S advised Douglas that he could not be officially associated with AT Systems without having to disclose his criminal record. Therefore, Weiss and R & S advised Douglas to distance himself from AT Systems. To achieve this objective, Douglas, Weiss and R & S decided to install Robert Minervino ("Minervino") as president and sole shareholder of Analytic Trading Systems, Inc. and Norman Rothenbaum, an R & S attorney, as registered agent. Minervino

had been hired by Douglas from a temporary employment agency and was performing clerical work for Douglas. Minervino continued to perform clerical work even after he became Analytic Trading Systems, Inc.'s president. Weiss and R & S knew that Minervino was unqualified to act as the president and that he had not paid anything for his stock in the company. Weiss and R & S also knew that Douglas was still running AT Systems and Analytic Trading Systems, Inc. In fact, these attorneys continued to consult Douglas, not Minervino, on decisions and matters relating to AT Systems.

During this time, AT Systems was funded with money from new investors as well as monies previously invested by others in D & S. At no time were the securities of AT Systems registered with the Securities & Exchange Commission ("SEC"). Equally telling, the securities of AT Systems were not registered under the laws of the states in which they were being offered for sale.

In connection with the sale of interests in AT Systems, Douglas prepared and mailed or delivered promotional materials to potential investors. These promotional materials made numerous fraudulent misrepresentations and omissions of material fact including, but not limited to, failure to disclose Douglas' criminal activities and convictions, failure to disclose the state and federal investigations of D & S, and failure to disclose in the promotional materials that the AT Systems securities were not registered. The AT Systems promotional material was relied upon by persons who invested in AT Systems.

Thereafter, the complaint alleges that in or about March, 1989, due to perceived problems of Douglas' association with AT Systems, Weiss and R & S advised Douglas to form a new entity. Douglas, Weiss and R & S then created Analytic Trading Service, Inc. Analytic Trading Service, Inc. was to be the general partner of yet another new trading partnership, AT Service. R & S and Weiss performed the legal services in connection with the creation of this new

trading partnership.[5]  Once again, Douglas appointed Minervino and later Sharon Hidaka ("Hidaka"), as president and sole shareholder of AT Service.  Hidaka was a client of R & S.  As was the practice with AT Systems and Analytic Trading Systems, Inc., R & S continued to consult Douglas, not Minervino nor Hidaka on decisions and matters relating to AT Service.

Weiss and R & S knew that Douglas planned to recruit new investors and salespersons for AT Service in an illegal manner.  These new investors and salespersons were recruited by concealing his criminal record, the state and federal investigations, and Douglas' inability to deal lawfully in securities.  Nevertheless, Weiss and R & S prepared National Futures Association registration applications for some investors, including the LaVinkas, without disclosing to them what R & S knew about Douglas and the entities.  For example, the securities of AT Service were not registered with the SEC nor under the laws of the states in which they were being offered for sale.  Also, AT Service was not registered as a limited partnership even though the investments were being marketed as limited partnerships.

At a meeting of salespersons or associated persons, investors, and prospective investors on June 14, 1989, the attendees were told that AT Service had the full support of Douglas' law firm.  Promotional materials were handed out at the meeting, and Weiss and R & S received the materials no later than June 20, 1989.  Once again, these promotional materials contained numerous misrepresentations and omissions of material fact.  Weiss and R & S knew that the omissions of Douglas' criminal record; the restructuring of AT Systems to allow Douglas to trade securities; the fact that the securities were not registered; and the false profits and lack of identification of the true risks of the investments were misleading.  Weiss and R & S also knew and were informed by Michael Moore ("Moore"), on June 20, 1989,

that Douglas was using the R & S name to make AT Systems appear more credible.

In addition to all of this, no later than June, 1989, Weiss and R & S learned that $4,000,000 of the money used to liquidate D & S came from AT Systems not D & S; that $21,000,000 was missing from AT Systems' accounts; that Douglas was involved in fraud; and that he was using R & S' name to further the fraud.  Weiss and R & S also knew that Douglas had falsified trading documents and falsely claimed that large amounts of money missing from AT Systems were in certain accounts controlled by Conners, another of Weiss' clients.  By May or June, 1989, Weiss and R & S also knew that Douglas was spending exorbitant amounts of money on personal items such as luxury homes and aircraft and that he could only afford these items by misappropriating investors' money.

On June 20 or 21, 1989, Weiss and R & S resigned from their representation of Douglas and the entities.  They advised their other clients, Moore and Hidaka, to disassociate themselves from Douglas.  Neither Weiss nor R & S advised the investors, regulatory and law enforcement authorities or associated persons of Douglas' unlawful activity.  Weiss' employment at R & S terminated on June 30, 1989.  Approximately five months later, the SEC shut down Douglas' operations on November 13, 1989.  Douglas pleaded guilty to three counts of mail fraud and one count of providing false information to the SEC.  The net loss to the receivership entities and the investors exceeds $24,000,000.

## IV.  ANALYSIS—THE SMB DEFENDANTS

### 1.  Counts I and II—Legal Malpractice & Breach of Fiduciary Duty

■  As its first line of attack, SMB argues that the Magistrate Judge incorrectly concluded that SMB owed a duty to the

---

**5.**  Douglas, R & S, and Weiss also created other entities including Market Systems, Inc. and the Waveland Group Limited Partnership, which were owned and controlled by Douglas, his

friends and family, and other clients of Weiss.  These entities were used by Douglas to control AT Systems and AT Service.

investor plaintiffs based on his conclusion that the entities created by Douglas were general partnerships, not limited partnerships and that SMB should have known it was representing a general partnership. This objection merits no extended discussion.

Magistrate Judge Weisberg found that the partnerships were not limited partnerships due to the fact that Douglas never complied with the requirements of creating valid limited partnerships. *See, e.g., Deporter–Butterworth Tours, Inc. v. Tyrrell,* 151 Ill.App.3d 949, 104 Ill.Dec. 821, 827, 503 N.E.2d 378, 384 (1987).[6] Starting from this premise, he concluded that SMB did not owe a duty to the individual partners but that SMB did owe a duty to its clients, the partnership entities. Unfortunately for SMB, they were in a unique position in that they knew that the managing partner, Douglas, was defrauding the partnerships. Thus, under this particular factual scenario, SMB could only fulfill its duty to its clients, the partnerships, by informing the investor partners of Douglas' fraudulent activities. We agree with the Magistrate Judge and overrule this first objection.

■ As their second avenue of attack, SMB strenuously objects to the report's statement that SMB's motion to dismiss does not attack the claims in Counts I and II brought by the Receiver on behalf of the entities. In its one paragraph objection, SMB simply refers to its underlying supporting memorandum where it cryptically argues that both the Receiver and the investor class failed to plead claims for legal malpractice or breach of fiduciary duty. However, SMB did not advance any legal arguments in either its underlying brief or in its objections specifically directed at the claims brought on behalf of the receiver-

ship entities. Accordingly, this objection is overruled.

■ Equally without merit, is SMB's objection that Counts I and II should be dismissed for failure to describe the subject matter for which SMB was retained. Specifically, SMB asserts that plaintiffs "must show the existence of a specific duty which arises from an attorney-client relationship with respect to the subject matter of the services for which the attorney was retained." (SMB's Objections, pp. 4–5.)[7] SMB maintains that plaintiffs' complaint is fatally deficient because there are no allegations of initial meetings, instructions or discussions of any kind with SMB regarding the scope of its legal representation. We do not agree.

In their complaint, plaintiffs allege that at their first meeting Douglas informed SMB that his objectives were to "stay in bus[iness] and to stay out of jail." (Compl., par. 29.) Thereafter, the complaint avers that SMB was retained by the partnership entities and Douglas for criminal defense matters and for corporate and securities matters. For example, plaintiffs allege, among other things, that SMB assisted in rescission offers and that they represented the receivership entities on issues before the SEC. Based on the foregoing, plaintiffs' factual allegations that SMB represented Douglas and the receivership entities on securities matters and other issues is sufficient to withstand a motion to dismiss and to satisfy the federal rule's pleading requirements. SMB's objection that plaintiffs did not plead the scope or subject matter of SMB's representation is wholly without merit.

■ Finally, SMB objects to the Magistrate Judge's conclusion that although

---

**6.** We agree with this result as we are mindful of our obligation to construe all inferences in plaintiffs' favor in ruling on a 12(b)(6) motion. At this juncture, it is entirely possible that the entities would be shown not to be limited partnerships.

**7.** SMB relies on *York v. Stiefel,* 109 Ill.App.3d 342, 64 Ill.Dec. 888, 440 N.E.2d 440 (Ill.App.Ct. 1982), *aff'd in part, rev'd in part,* 99 Ill.2d 312, 76 Ill.Dec. 88, 458 N.E.2d 488 (1983), for the

proposition that a plaintiff must show the subject matter of the attorney/client relationship to succeed in a legal malpractice action and must also plead the scope of this subject matter in the complaint. *York,* however, is inapposite. The *York* court did not address federal pleading requirements. Rather, the court was analyzing the requirements which must be established in order to bring an attorney malpractice/negligence action.

SMB did not owe duties to the individual partners it owed duties to the partners collectively as the partnership as contrary to existing case law. This objection is substantially related to SMB's earlier argument that the report based its analysis on the incorrect legal conclusion that the partnership entities were general partnerships. In point of fact, SMB cites and makes virtually the same argument now which it made before the Magistrate Judge in its underlying briefs. In our view, the Magistrate Judge's interpretation of the relevant case law was persuasive and we summarily reject this objection. In sum, we overrule this and all of SMB's objections directed at Counts I and II.[8]

### 2. Count III—Violation of Section 10(b) of the Securities Exchange Act

The investor class alleges that SMB is both primarily and secondarily liable under Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Magistrate Judge Weisberg agreed with SMB that the class plaintiffs' allegations of primary liability under Rule 10b–5 were wholly defective. He granted SMB's motion to dismiss limited to that claim. However, the Magistrate Judge denied SMB's motion with respect to the class plaintiffs' allegations of secondary liability. We agree with Magistrate Judge Weisberg on both scores.

As a preliminary matter, the class plaintiffs did not object to the Magistrate Judge's conclusion that the allegations of primary liability were deficient. Accordingly, this court adopts Magistrate Judge Weisberg's well-reasoned analysis on this point and dismisses the class plaintiffs' claims of primary liability under Section 10(b) and Rule 10b–5 against SMB. We now address the objections.

SMB does object, however, to Magistrate Judge Weisberg's conclusion that the class plaintiffs' allegations of secondary liability under Rule 10b–5 are sufficient. SMB mounts a three-pronged attack and argues that: (1) any alleged misrepresentation by SMB to the SEC cannot fulfill the causation requirement; (2) SMB did not have any affirmative duty to disclose Douglas' fraudulent activities to the investors; and (3) plaintiffs have failed to allege scienter on the part of SMB.

■ First, SMB argues that the Magistrate Judge's finding that liability under Rule 10b–5 is not limited to misleading statements or omissions addressed to purchasers is contrary to Seventh Circuit precedent as established in *Renovitch v. Kaufman*, 905 F.2d 1040 (7th Cir.1990). In this same vein, SMB argues that it cannot be liable for its alleged misrepresentations to the SEC. SMB is wrong on both counts.

In *Renovitch*, the Seventh Circuit held that to succeed on a secondary liability claim under Rule 10b–5 and Section 10(b) against the attorneys for the primary violator, the plaintiff had to show, *inter alia*, that he was adversely affected by the actions of the attorneys. *Renovitch*, 905 F.2d at 1046. The investor plaintiffs have done so. The investor class alleges that they relied on false and misleading statements made by SMB in investing and continuing to invest in the receivership entities and that had they been fully advised of the true facts they would not have invested in the fraudulent schemes. The investor class alleges that SMB took affirmative steps which directly and adversely affected them. In their complaint, the plaintiff class alleges, among other things, that SMB advised Douglas to make a rescission offer to all D & S investors, provided verifications to the SEC which they should have known were materially misleading, knowingly misrepresented to the SEC that Douglas had no control over D & S accounts, and misrepresented to the SEC that

---

**8.** SMB argues in a mere footnote that Scholes, as Receiver for the entities, lacks standing to raise a breach of fiduciary duty claim on behalf of the entities. This court will not consider new arguments and theories raised for the first time in objections to a Magistrate Judge's report.

*See Anna Ready Mix, Inc. v. N.E. Pierson Constr. Co.*, 747 F.Supp. 1299, 1303 (S.D.Ill.1990). It was incumbent upon SMB to raise these issues in its underlying brief. This they failed to do. We overrule this belated objection.

it knew nothing about AT Systems. (Report and Recommendation, p. 22.) Therefore, the complaint sufficiently alleges that the plaintiff investors were adversely affected by SMB's material misstatements or omissions.

■ By the same token, SMB's argument that they cannot be liable under an aiding and abetting theory for making misrepresentations to the SEC is wrong. We agree with the Magistrate Judge that one can aid and abet a securities fraud by misleading public officials. *See Mercer v. Jaffe, Snider, Raitt and Heuer, P.C.,* 713 F.Supp. 1019, 1025 (W.D.Mich.1989). This objection is overruled.

■ Next, SMB argues that it cannot be liable under an aiding and abetting theory because it had no affirmative duty to the investors to disclose the truth. In support, SMB cites, without any legal analysis, to three Seventh Circuit cases. *Renovitch v. Kaufman,* 905 F.2d 1040, 1048 (7th Cir. 1990); *DiLeo v. Ernst & Young,* 901 F.2d 624, 628 (7th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 496 (7th Cir.1986). However, unlike the factual scenario present in those cases, the plaintiff class is not merely alleging that SMB failed to "tattle" on its client to third parties. Rather, the plaintiff class asserts that SMB was an active participant in the fraudulent scheme. As such, SMB had a duty to disclose Douglas' fraud to the plaintiff investors. In our view, this is sufficient to distinguish these cases.

■ Third, SMB asserts that the plaintiff investors have failed to allege scienter which is necessary for a Rule 10b–5 claim. SMB is wrong. The class plaintiffs allege that SMB took affirmative steps to keep Douglas in business while they were aware of his criminal past and even his continuing fraudulent schemes. Clearly, this satisfies the scienter requirement which in the securities context is the "intent to deceive, manipulate, or defraud.... [R]eckless conduct also satisfies the requirement of wrongful intent." *Renovitch,* 905 F.2d at 1046 (citing *Ernst & Ernst v. Hochfelder,*

425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976)). Assuming the truth of the class plaintiffs' allegations, as we must on a motion to dismiss, this amounts to reckless conduct at a minimum. Therefore, because the class plaintiffs allege that SMB affirmatively acted to keep Douglas in business in face of its knowledge that he was defrauding the partnerships, the class has sufficiently alleged scienter. The Magistrate Judge properly denied SMB's motion to dismiss with respect to Count III.

### 3. *Count IV—Common Law Fraud*

Magistrate Judge Weisberg concluded that the complaint sufficiently pled a claim for common law fraud. SMB disagrees and makes two objections. First, SMB argues that there is no separate cause of action for aiding and abetting fraud in Illinois. Second, SMB argues that the investor class has failed to sufficiently plead scienter. Because the scienter argument was disposed of with regard to Count III, this objection is overruled without further elaboration.

■ SMB's first objection also will not be sustained. SMB relies on *Renovitch* for the proposition that Illinois does not recognize a cause of action for aiding and abetting a fraud. However, Magistrate Judge Weisberg properly concluded that the plaintiff class sufficiently alleged SMB's knowing participation in a fraud. In *Shacket v. Philko Aviation, Inc.,* the district court noted that under Illinois law a person who knowingly participates in a fraud is guilty of that fraud. *Shacket v. Philko Aviation, Inc.,* 590 F.Supp. 664, 668 (N.D.Ill.1984) (citing *Callner v. Greenberg,* 376 Ill. 212, 33 N.E.2d 437 (1941); *Beaver v. Union Nat'l Bank and Trust Co.,* 92 Ill.App.3d 503, 47 Ill.Dec. 223, 414 N.E.2d 1339 (1980); *Moore v. Pinkert,* 28 Ill.App.2d 320, 171 N.E.2d 73, 78 (1960)). Thus, because the class plaintiffs allege that defendants knowingly participated in Douglas' fraudulent schemes, the complaint alleges a valid fraud claim under Illinois law. We agree with Magistrate Judge Weisberg's recommendation and overrule all of SMB's chal-

lenges to the class plaintiffs' claim for common law fraud.

## V. ANALYSIS—THE R & S DEFENDANTS

In the amendment to the complaint, plaintiffs added five counts against R & S. Plaintiffs have asserted claims for legal malpractice/negligence against R & S (Count V), and breach of fiduciary duty against R & S (Count VI). In addition, the putative class of plaintiffs have alleged claims for violations of Section 12(2) of the Securities Act by R & S (Count VII), violations of Section 10(b) of the Exchange Act and Rule 10b–5 against R & S (Count VIII) and common law fraud against R & S (Count IX). R & S moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).[9]

### 1. *Count V—Legal Malpractice/Negligence*

Plaintiffs allege that R & S as the attorneys for the receivership entities owed the receivership entities and the investor class the "duties to exercise due professional care and to render their professional services in a professional and ethical manner." Amendment to Complaint, par. 103. Plaintiffs assert that R & S breached their duties by, among other things, counseling Douglas not to disclose his past criminal conduct, concealing Douglas' interest and control of AT Systems and AT Service, not disclosing to the receivership entities or its investors that Douglas was engaged in fraudulent schemes of which they were aware, not properly supervising R & S attorneys, continuing to represent Douglas and the receivership entities notwithstanding an obvious conflict of interest, not re-

porting Douglas' illegal activities to the investors or regulatory authorities and failing to take appropriate actions to disclose Douglas' conduct to members of the investor class. Plaintiffs further allege direct harm to them caused by R & S' alleged malpractice/negligence.

■ In response, R & S argues that Count V must be dismissed because plaintiffs did not allege, and indeed could not allege, the existence of an attorney-client relationship between R & S and the receivership entities and its investors. This argument is wholly without merit. After a careful review of the allegations of plaintiffs' complaint, and taking the allegations as true, as we must for purposes of this motion to dismiss, we find that plaintiffs have alleged sufficient facts to establish an attorney-client relationship. (Amendment to Compl., pars. 3 and 103.) Therefore, Count V will not be dismissed on this ground.

■ In its supplemental briefs, R & S additionally argues that Count V must be dismissed in light of the Illinois Supreme Court's recent decision in *Collins v. Reynard*, 1991 WL 220561, 1991 Ill. LEXIS 104 (Oct. 31, 1991).[10] Essentially, R & S asserts that after *Collins* plaintiffs are precluded from maintaining a claim for attorney malpractice under a tort theory of negligence. *Collins* is a legal malpractice suit based on an attorney's negligently drafted sales contract. Collins retained Reynard to negotiate the installment sale of her business. *Collins* at * 6, 1991 Ill. LEXIS at * 2. Reynard negligently drafted, or approved, a sales contract that failed to reflect Collins' intention to retain a first priority secu-

---

**9.** R & S argues that plaintiffs' allegations should be dismissed pursuant to Fed.R.Civ.P. 9(b) because they are not pled with the sufficient particularity. We disagree. "In a securities fraud case, plaintiffs need only describe the outline of the fraudulent scheme and need not set forth facts which, because discovery has not been completed, are in the exclusive possession of defendants." *Carter v. Signode Indus., Inc.,* 694 F.Supp. 493, 500 (N.D.Ill.1988) (citing *Morgan v. Kobrin Securities,* 649 F.Supp. 1023, 1028 (N.D.Ill.1986); *Banowitz v. State Exchange*

*Bank,* 600 F.Supp. 1466, 1469 (N.D.Ill.1985)). This is especially true where, in a securities fraud case, the allegations of the fraudulent conduct focus on omissions which are normally in the possession of the defendants. Therefore, this argument fails and R & S' motion to dismiss pursuant to Rule 9(b) is denied without further discussion.

**10.** On February 3, 1992, the Illinois Supreme Court granted a petition to rehear *Collins.*

rity interest in her business. As a result, when the buyer defaulted after having pledged the assets to the bank, the bank had a superior security interest in the business and assets. Collins had a ready, willing, and able buyer but, due to the bank's superior security interest, was unable to complete the sale. Thus, Collins sued Reynard for the money due under the original installment sales contract with the original buyer. *Collins*, at * 2, 1991 Ill. LEXIS at * 3. Reynard moved to dismiss arguing that Collins was seeking purely economic damages under a negligence theory which was barred by *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). The Illinois Supreme Court upheld the lower court's decision to dismiss the action based on the *Moorman* doctrine.

In its decision, the Illinois Supreme Court confronted two issues: (1) was Collins seeking purely economic damages and, (2) if so, does the *Moorman* doctrine preclude recovery of economic damages for attorney malpractice in tort. The *Collins* court answered both questions in the affirmative but noted several exceptions.

The Court first determined that Collins sought purely economic damages. In so holding, the Court continued to define economic loss as " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property.' " *Collins*, at * 2, 1991 Ill. LEXIS at * 3– * 4 (citing *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 149, 104 Ill.Dec. 689, 503 N.E.2d 246 (1986)). The Court further stated that "[e]conomic damages have been characterized as objectively verifiable monetary losses, including medical expenses, loss of earnings, burial costs, loss of the use of property, costs of repair or replacement, costs of obtaining substi-

tute domestic services, loss of employment, and loss of business and employment opportunities." *Collins*, at * 2, 1991 Ill. LEXIS at * 4– * 5. The Court then held that the damages Collins was seeking—the remaining payments due under the installment sales contract—were purely economic. *Collins* at * 2, 1991 Ill. LEXIS at * 6. We believe that plaintiffs here are also seeking purely economic damages. Their losses are "objectively verifiable monetary losses" with no allegations of personal injury or damage to any other property. Thus, plaintiffs are seeking purely economic damages. This conclusion, however, does not end the inquiry.

Once this issue had been resolved in *Collins*, the Illinois Supreme Court faced the next issue of whether a plaintiff could recover purely economic damages from an attorney for legal malpractice under a negligence theory. The Court ultimately held that Collins could not recover because "[c]ontract law provides a superior basis to tort law for the resolution of issues concerning the failed expectations of clients of professionals where only economic loss is sought to be recovered." *Collins* at * 5, 1991 Ill. LEXIS at * 14. The Court did specifically note that there are exceptions to this general rule.

The Illinois Supreme Court did not eliminate the recovery of economic losses for actions premised on claims of intentional fraud or misrepresentation.[11] The *Collins* Court also noted that economic losses may be recovered through a malpractice claim based on negligence where the defendant owes extracontractual duties to the plaintiff. *Collins* at * 5, 1991 Ill. LEXIS at * 10. Finally, after dismissing Collins' complaint, the *Collins* Court stated in dicta that "a different result may be reached where there is fraud present or where extracontractual, fiduciary or ethical duties are at issue, despite the fact that the damages

---

**11.** Economic losses can be recovered in tort "(1) when one intentionally makes false representations, or (2) when one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations." *Collins*, at * 2, 1991 Ill. LEXIS at * 6 (citing *Moorman*, 91 Ill.2d at 88–89, 61 Ill.Dec. 746, 435 N.E.2d 443). The Court stated explicitly that the second exception does not apply to attorneys. Therefore, it is not relevant to the present case.

sought to be recovered are solely for economic loss...." *Collins* at * 5, 1991 Ill. LEXIS at * 15.

Turning to the present case, we believe that each exception to the *Moorman* doctrine delineated in *Collins* applies here. First, plaintiffs allege that R & S intentionally made false representations, knowingly omitted material facts, and knowingly furthered Douglas' fraudulent schemes. *Collins* expressly held that in such a situation the *Moorman* doctrine would not apply to bar recovery of economic damages under a tort theory. *Collins* at * 3, 1991 Ill. LEXIS at * 6 ("[E]conomic losses [are] recoverable ... when one intentionally makes false representations....") Clearly, this case falls into an expressly enumerated exception to *Collins.* We reject R & S' suggestion that the misrepresentation exception recognized in *Moorman* and *Collins* only allows economic losses to be recovered in a fraud count.

Equally important, the second exception enumerated in *Collins* also applies. Where extracontractual duties are owed by attorneys to injured parties, the *Moorman* doctrine does not bar the recovery of economic damages. The Court reasoned that cases applying such an exception have allowed plaintiffs to recover because plaintiffs "did not have the bargained for protection of a contractual agreement." *Collins,* at * 4, 1991 Ill. LEXIS at * 11. Magistrate Judge Weisberg determined, and we agreed, that SMB as lawyers for the receivership entities owed a duty to the plaintiff investors to disclose Douglas' fraudulent conduct with respect to the receivership entities. As there was no express contract between SMB and the plaintiff investors, it logically follows that the duty was extracontractual. This conclusion applies with equal force to R & S. Therefore, plaintiffs' allegations squarely fit within the extracontractual duty exception recognized in *Collins.*[12]

Finally, the third reason for finding *Collins* distinguishable is the fraud exception. Although dicta, the *Collins* Court expressed its reservations in applying the *Moorman* doctrine to an attorney malpractice action based on a tort theory in which fraud is alleged. *Collins* at * 5, 1991 Ill. LEXIS at * 15. This court believes that if faced with the present factual scenario the Illinois Supreme Court would find that the exceptions to the *Moorman* doctrine apply. The *Moorman* doctrine was created to alleviate the assumed unfairness in exposing professionals to unlimited and unforeseen liability for economic loss to injured parties. It was thought that contract damages were a superior remedy because they do not expose defendants to unforeseen, and thus unfair, liability. *Collins* at * 5, 1991 Ill. LEXIS at * 15. Where fraud is alleged, as here, these principles do not apply. Any damages owed would not come as a surprise because defendants had knowledge of its wrongful acts. Therefore, the principles underlying the *Moorman* doctrine do not support its application here. Because fraud is alleged here, and because this court believes that the Illinois Supreme Court would find that the *Moorman* doctrine does not apply to such a situation, we hold that *Collins* does not bar this action. R & S' motion to dismiss Count V is denied.

### 2. *Count VI—Breach of Fiduciary Duty*

R & S next argues that plaintiffs' claim of breach of fiduciary duty should be dismissed because, as with regard to Count V, plaintiffs failed to allege an attorney-client relationship between R & S and the partnership entities or investors. As previously stated regarding Count V, plaintiffs have alleged sufficient facts which, if proven, show that a sufficient relationship existed between plaintiffs and R & S. Because this relationship gives rise to a fiduciary duty from R & S to plaintiffs, plaintiffs have alleged sufficient facts to support such a claim.[13] Therefore, R & S' motion to dismiss Count VI is denied.

---

**12.** We decline to follow R & S' reasoning that breaches of extracontractual duties are actionable *only* where the non-clients are third-party beneficiaries of the attorney-client contract.

**13.** By the same token, we reject R & S' argument that *Collins* bars a negligence claim seeking economic losses when the negligence claim includes allegations of breach of fiduciary duty.

### 3. *Count VII—Violation of Section 12(2) of the Securities Act of 1933*

R & S argues that Count VII which alleges claims for both primary and secondary liability under Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2) ("Section 12(2)"), should be dismissed because the investor class failed to allege that any of the defendants sold or solicited the sale of any securities. Specifically, R & S argues that proximate cause and aider and abettor allegations are insufficient to state a cause of action under Section 12(2). Section 12(2) of the Securities Act imposes liability on any person who "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading...." 15 U.S.C. § 77*l* (2).

R & S cites *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), for the proposition that the term "seller" under Section 12(1) is limited to only those who actually pass title to the securities and to those who solicit the purchase of securities for financial gain. R & S argues that because they did not pass title to securities nor solicit the purchase of securities they are not "sellers" under Section 12(1). We agree with R & S that this is an accurate reading of *Pinter*. *Pinter* did not expand liability under Section 12(1) to participants who may have facilitated the sale but were not statutory sellers. *Pinter*, 108 S.Ct. at 2080; *Ackerman v. Schwartz*, 947 F.2d 841, 844 (7th Cir.1991). While *Pinter* dealt exclusively with primary liability under Section 12(1), numerous authorities (including this circuit) have applied the *Pinter* analysis to claims under Section 12(2) because the word "sell" has the identical meaning in Section 12(1) as in Section 12(2). *Ackerman*, 947 F.2d at 844–45; *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1125–26 (2d Cir.1989); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 536 (9th Cir.1989).

In our view, the class plaintiffs attempt to pin liability on R & S under 12(2) for "controlling the issuers" and "generally contributing to the selling momentum" (Amendment to Compl., par. 114) is wholly defective. As a matter of law, R & S cannot be liable to the class plaintiffs for allegedly substantially participating in or leading the investor plaintiffs to purchase securities from Douglas. The Supreme Court in *Pinter* has expressly "considered and rejected the 'substantial factor' approach to liability under § 12." *Ackerman*, 947 F.2d at 845; *Pinter*, 108 S.Ct. at 2079–82. The class plaintiffs claim against R & S for primary liability under Section 12(2) is accordingly, dismissed with prejudice.

In addition, R & S argues that the Seventh Circuit has not recognized a right of action for aiding and abetting liability under Section 12(2). For this proposition, R & S cites *Schlifke v. Seafirst Corp.*, 866 F.2d 935 (7th Cir.1989). In *Schlifke*, investors in a limited partnership investment program sued the bank that financed the program. The plaintiffs attempted to impose aiding and abetting liability on the defendant bank under Section 12(2). In declining to recognize a new implied right of action under Section 12(2), the Seventh Circuit stated that "notions of aiding and abetting liability would be inconsistent with the intent and language of the statutory provision which expressly limits to offerors and sellers the categories of persons who may be sued." *Schlifke*, 866 F.2d at 942. In *Ackerman* the Seventh Circuit reaffirmed this view and stated "we stand with *Schlifke* in holding that there is no liability for aiding or abetting a violation of § 12." *Ackerman*, 947 F.2d at 845 (citing numerous authorities therein). R & S' motion to dismiss the class plaintiffs' claim for aiding and abetting liability under Section 12(2) is granted. Count VII is dismissed with prejudice.

### 4. *Count VIII—Violation of Section 10(b) of the Securities Exchange Act of 1934*

#### a. Primary Liability

The class plaintiffs allege that R &

S violated Section 10(b) [14] of the Exchange Act and Rule 10b–5 promulgated thereunder under theories of primary and secondary liability. In order to state a claim under Section 10(b) and Rule 10b–5 for primary liability, a plaintiff must demonstrate that defendant "(1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (2) in connection with a securities transaction, (3) with the intent to mislead, and (4) which caused plaintiff's loss." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989). Equally important, only an issuer, director, signatory of a prospectus, identified drafter of documents, offeror or seller of securities or those who control them may be primarily liable. *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir.1986). R & S argues that Count VIII is defective because plaintiffs failed to allege all four requisite elements. For the first time in its reply brief, R & S argues that it is not primarily liable because it was not a drafter, or issuer of documents, or an offeror or seller of securities.

#### i) *Material Misrepresentations and Omissions*

R & S argues that Count VIII fails to allege that Weiss or R & S made any misrepresentations of material fact to anyone.[15] R & S argues that Douglas and other nonparties only made misrepresentations or omissions, not R & S. The class plaintiffs allege that Weiss drafted the documents used to implement the rescission offers in Illinois and Wisconsin. The class further alleges that these rescission documents omitted material facts which, if included, would have affected the class plaintiffs' investment decisions. The class also alleges that Weiss drafted Douglas' affidavit and a letter containing false statements which were then sent to the Illinois and Wisconsin securities departments. After discovering that the statements made in the affidavit and letter were false, Weiss corrected the letter to the Wisconsin authorities but never corrected Douglas' affidavit tendered to the ISD.

Furthermore, Section 10(b) and Rule 10b–5 are not limited to misrepresentations and omissions. Rule 10b–5 prohibits the engagement in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. Section 240.10b–5(c). Here, the class plaintiffs allege that R & S actively perpetuated Douglas' fraudulent schemes by concealing his criminal record and advising him on how to continue in business when they knew of his illegal activities.

Lastly, a failure to disclose material information when one has a duty to disclose is actionable under Rule 10b–5. *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1125 (7th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). As discussed above, R & S had a duty to inform the receivership entities of Douglas' fraudulent activities. Therefore, the class plaintiffs have sufficiently alleged facts to state a claim for primary liability under Section 10(b) and Rule 10b–5.

#### ii) *In Connection With a Transaction*

R & S next takes issue with the class plaintiffs' failure to allege that defendants made untrue statements or omissions "in connection with a securities transaction." However, the class plaintiffs allege throughout their complaint that R & S' omissions, misrepresentations, and other acts were connected with securities transactions. Indeed, R & S in its memorandum in support of its motion to dismiss devotes

---

**14.** Section 10(b) prohibits any person from using or employing "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security.

**15.** R & S also strenuously argues that, at the very least, Count VIII should be dismissed with respect to Rosenthal because the complaint does not even allege that he made any statements or omissions whatsoever. However, the court declines to do so at this point. Plaintiffs allege that Rosenthal was the majority shareholder in R & S. As such, he is a proper party defendant because a general partner is generally liable for wrongful acts committed by his partners. *See, e.g., Kravetz v. Brukenfeld*, 591 F.Supp. 1383, 1387 (S.D.N.Y.1984).

only two sentences to this argument. Thus, this cursory argument is rejected without further discussion.

### iii) *Scienter*

As their third line of attack, R & S asserts that the class plaintiffs failed to allege scienter. This argument must fail. The Seventh Circuit has held that scienter under Section 10(b) and Rule 10b–5 is satisfied by "reckless conduct." *Robin v. Arthur Young & Co.*, 915 F.2d at 1126. Here, the class has alleged sufficient facts showing reckless conduct by R & S. The class alleges that R & S knew of Douglas' fraudulent activities and advised him to, and took affirmative steps toward, keeping him in business. Therefore, the class has sufficiently pled scienter.

### iv) *Causation*

Finally, R & S briefly argues that the class plaintiffs failed to satisfy the causation requirement because they failed to allege that any investors relied on any omissions or misrepresentations. This argument must also fail. The class alleges that R & S omitted material facts and that they participated in the fraud. In such circumstances, it is unnecessary to allege reliance by the class plaintiffs. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Therefore, this argument cannot stand.

### b. Secondary Liability

In order to establish a claim for secondary liability, a plaintiff must satisfy the following two elements: "(1) that the alleged aider and abettor, in connection with the purchase or sale of a security, committed one of the 'manipulative or deceptive' acts prohibited under § 10(b) and Rule 10b–5, and (2) that the alleged aider and abettor acted with *scienter*, which is the same mental state required for primary liability." *Renovitch*, 905 F.2d at 1045. R & S argues that the class plaintiffs have failed to sufficiently allege either of these two elements rendering its secondary liability claim fatally defective. We do not agree. As the class plaintiffs have sufficiently alleged a primary liability claim it logically follows that the secondary liability claim is likewise sufficient. R & S' motion to dismiss Count VIII is denied.

### 5. *Count IX–Fraud*

R & S argues that Count IX must be dismissed for failure to allege the requisite elements of fraud. We do not agree. As previously discussed with regard to SMB, the class plaintiffs have sufficiently pleaded a claim for fraud against R & S. In Illinois, "a person who knowingly participates in a fraud or who knowingly accepts the fruits of fraudulent conduct is also guilty of that fraud." *Shacket v. Philko Aviation, Inc.*, 590 F.Supp. 664, 668 (N.D.Ill.1984). Therefore, because the class plaintiffs alleged that R & S knowingly participated in Douglas' fraud, R & S' motion to dismiss Count IX is denied.

## VI. ATTORNEYS' FEES AND COSTS

■ Finally, consistent with our decision to deny SMB's motion to dismiss Counts I through IV of plaintiffs' complaint, we also reject SMB's argument that sanctions be awarded against Prior and his client, Scholes, under Rule 11 of the Federal Rules of Civil Procedure. As an initial matter, SMB argues that the advisory committee notes to Rule 11 recommends that a motion for sanctions be entered and continued and resolved at the conclusion of the litigation. (SMB's Reply in Support of Sanctions, p. 1). In this same vein, SMB requests that before the court addresses its Rule 11 motion, the parties be given an opportunity to more fully address the issues raised by its motion. (SMB's Reply in Support of Sanctions, p. 9). We disagree with SMB on both scores.

First, the advisory committee notes to Rule 11 provide, in relevant part, that "[t]he time when sanctions are to be imposed rests in the discretion of the trial judge. However, it is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation, and in the case of motions at the time when the motion is decided or shortly thereafter." Fed. R.Civ.P. 11 advisory committee's note. In this court's view, it is particularly appropri-

ate to evaluate SMB's motion for sanctions at this time in light of this court's resolution of the dismissal motion. After careful consideration of SMB's motion to dismiss, the court is fully conversant with the facts and issues of the case. The court will exercise its discretion and entertain SMB's motion for sanctions in order to promote judicial economy, efficiency and fairness to the litigants.

Second, the court strongly disagrees with SMB's suggestion that the parties be given a second chance to more fully address the issues raised in its motion for sanctions. Both parties are represented by capable counsel who have already been afforded one opportunity to fully brief this issue. In fact, this court has devoted considerable time and energy combing through the briefs and voluminous exhibits with respect to both the Rule 11 motion and the underlying 12(b)(6) motion to dismiss. We have thoroughly considered all pleadings in this case and have no intention of entertaining a second round of briefs on the very same point. We now address SMB's motion for sanctions.[16]

■■■ SMB argues that Prior and the Receiver should be sanctioned for filing a complaint that is ungrounded in fact and law. SMB asserts that plaintiffs' lawsuit is without legal basis in four principal respects:

(1) Stone McGuire represented Michael S. Douglas individually as criminal counsel from June 1, 1988 to November 13, 1989 and at no time represented D & S, AT Systems or AT Service in connection with the purchase or sale of any securities or in any capacity;

(2) Stone McGuire never counselled, represented or sought to furnish legal advice to any investors or class of investors;

(3) Stone McGuire owed no duty to any of the plaintiffs' herein; and

(4) the securities laws do not recognize the cause of action alleged by plaintiffs' against Stone McGuire. (SMB's Brief in Support of Sanctions, p. 2).

These arguments merit no extended discussion. Rule 11 provides that where an attorney or a party files pleadings that are not reasonably based on the law or in fact, or a good faith argument for the extension of existing law, sanctions are appropriate for expenses incurred, including attorneys' fees. Fed.R.Civ.P. 11. For purposes of Rule 11, litigation is deemed frivolous where a party or his attorney fails to make a reasonable inquiry into the facts or the law.

In this court's view, Counts I through IV of plaintiffs' complaint which allege claims of legal malpractice-negligence, breach of fiduciary duty, violations of Section 10(b) of the Securities Exchange Act and Rule 10b–5 and common law fraud are not so baseless, specious, or off the mark as to warrant the imposition of sanctions. Nor is there any basis for SMB's implication that plaintiffs filed their complaint to harass SMB and to abuse their access to the courts. (SMB's Reply in Support of Sanctions, p. 8). Lastly, plaintiffs have raised issues which relate to very fluid and evolving areas of the law. Plaintiffs' complaint is not so tenuous as to warrant the imposition of sanctions. SMB's motion for sanctions is denied.

## VII. CONCLUSION

For the reasons stated in this opinion, this court adopts Magistrate Judge Weisberg's Report and Recommendation dated June 27, 1991 denying SMB's motion to dismiss plaintiffs' complaint. In addition, the court grants R & S' motion to dismiss Count VII of the amendment to the complaint with prejudice and denies the motion with respect to Counts V, VI, VIII and IX. Finally, the court denies SMB's motion which requests an award of its attorneys' fees and costs pursuant to Rule 11 of the Federal Rules of Civil Procedure. SMB

---

**16.** On a related note, the filing of a motion for sanctions is in itself a very serious matter. It was SMB's obligation to fully set forth all facts in support of its Rule 11 motion in its initial brief. While the court does not believe that in making its request SMB was attempting to "sandbag" plaintiffs (or the court), there is simply no need for additional briefing.

and R & S shall answer plaintiffs' complaint and amendment to complaint respectively, on or before April 15, 1992.